## McDIVITT v. MAPES.

1. ESTATES OF DECEDENTS—INSOLVENCY—STIPULATIONS—BURDEN OF PROOF.

In suit by administrator *de bonis non* of the estate of defendant's deceased husband to recover assets of the estate claimed to have come into her hands while deceased was insolvent, the burden of proof would have been upon plaintiff to show insolvency at time of purchase of property by defendant and husband as tenants by the entireties rather than at time of death of husband had it not been for stipulation that issue of insolvency was determined as of later date, whereupon plaintiff then had burden of showing insolvency as of such later date but that creditors in whose behalf suit was brought were such creditors at time property was purchased (Act No. 288, chap. 7, § 14, Pub. Acts 1939).

2. SAME—CREDITORS—INSOLVENCY—FRAUD—TENANCY BY ENTIRETIES.

In suit by administrator *de bonis non* of the estate of defendant's deceased husband to recover assets of the estate claimed to have come into her hands while deceased was insolvent, wherein it was stipulated insolvency was determined as of date of death of husband, the true value of the assets at the time of death governs question of insolvency and lessened value of assets due to delay, expenses, obsolescence or deterioration or loss occasioned by continuance of undertaking business in course of administration may not be considered as long as deceased was solvent at time of his death and no fraud as to creditors is shown in making purchase of property and taking title thereto by deceased and wife as tenants by the entireties (Act No. 288, chap. 7, § 14, Pub. Acts 1939).

3. SAME—INSOLVENCY—TENANCY BY ENTIRETIES—FRAUD—EVIDENCE.

In suit by administrator *de bonis non* of the estate of defendant's deceased husband to recover assets of the estate claimed to have come into her hands while deceased was insolvent, plaintiff *held*, to have failed to establish that taking of land contract in names of husband and wife as tenants by the entireties was, by reason of insolvency of husband at time of his death, in fraud of creditors (Act No. 288, chap. 7, § 14, Pub. Acts 1939).

BOYLES, J., dissenting.

Appeal from Shiawassee; Collins (Joseph H.), J. Submitted June 30, 1941. (Docket No. 78, Calendar No. 41,604.) Decided October 6, 1941.

Bill by C. F. McDivitt, administrator of the estate of Clarence Edward Mapes, deceased, against Catherine I. Mapes to recover assets of the estate alleged to have come into the hands of defendant while deceased was insolvent. Decree for plaintiff. Defendant appeals. Reversed.

*Seth Q. Pulver* (*Milton G. Schancupp* and *Ellis J. Bowler,* of counsel), for plaintiff.

*George H. Wyatt,* for defendant.

WIEST, J. This is a bill in equity by the administrator *de bonis non* of the estate of Clarence E. Mapes, deceased, under the provisions of Act No. 288, chap. 7, § 14, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 16289-7[14], Stat. Ann. 1940 Cum. Supp. § 27.3178 [394]), known as the probate code, which superseded 3 Comp. Laws 1929, § 15668 (Stat. Ann. § 27.2815), to recover, in behalf of creditors, assets of the estate claimed to have come into the hands of defendant while the deceased was insolvent. By stipulation the issue of insolvency was determined as of the time of Mr. Mapes' death in December, 1937. In May, 1934, when Mr. Mapes owed debts, now allowed against his estate, he purchased, under land contract, in the names of himself and wife, jointly, a house and lot in the city of Durand for a funeral home. The contract price was $2,000, of which $500 was paid down, and $30 to be paid monthly thereafter. Up to June, 1937, when Mr. Mapes was taken sick, he made the monthly payments and thereafter payments were made by de-

fendant and, in September, 1939, the contract price being paid, defendant received a deed from the vendor. It is conceded defendant paid $840 on the land contract. Mr. Mapes was an undertaker and, to remodel and equip the premises as a funeral home, he spent considerable sums of money. No homestead right is involved.

The court found Mr. Mapes insolvent at the time of his death in December, 1937, by reason of insufficient assets in his estate, upon sale thereof, to pay debts contracted prior to the purchase of the Durand property and, in behalf of such creditors, decreed a lien upon the premises for $2,000 under a finding that such amount was expended by Mr. Mapes in the purchase and improvement of the property.

Defendant reviews by appeal and claims that, inasmuch as the inventory and appraisal of the estate showed solvency, it was not permissible to plant insolvency at the time of Mr. Mapes' death upon subsequent deficit by reason of inability to dispose of the assets at the appraised value.

The inventory and appraisal showed an estate sufficient to pay the alleged claims, but sums realized on sales of the assets, expenses of administration, and loss in carrying on the undertaking business in the course of administration, showed insufficient funds to pay the creditors in full.

Except for the stipulation mentioned, the burden would have been upon plaintiff to show that the deceased was insolvent at the time of the purchase of the Durand property in 1934. Under the stipulation the burden was on plaintiff to show that the deceased was insolvent at the time of his death in December, 1937, and the creditors, in whose behalf suit was brought, were such creditors at the time the Durand property was purchased in May, 1934.

The true value of the assets at the time of death governs upon the question of solvency or insolvency and any lessened value thereof, occasioned by delay in the course of the administration, for obsolescence or deterioration as well as expenses or loss in the course of the administration, cannot be considered upon the subject. Loss to the estate in carrying on the undertaking business may not be considered in reduction of assets, if sufficient at the time of Mr. Mapes' death to meet his obligations to creditors existing in May, 1934. The solvency of the deceased, as at the time of his death, is not to be made dependent upon costs of the administration of his estate or subsequent failure to realize the appraised amount, or loss occasioned by endeavors to carry on the former business of decedent. No fraudulent intent on the part of the deceased in purchasing the Durand property was charged or proven.

Mr. Mapes left a will and defendant herein was appointed executrix of the estate and served for a time; then plaintiff herein was appointed administrator.

Under the record plaintiff failed to establish the charge that the result of taking the 1934 land contract in the names of Mr. Mapes and his wife was, by reason of insolvency of Mr. Mapes at the time of his death, in fraud of his creditors.

The decree in the circuit court is reversed and decree will be entered in this court dismissing the bill, with costs to defendant.

SHARPE, C. J., and BUSHNELL, CHANDLER, NORTH, STARR, and BUTZEL, JJ., concurred with WIEST, J.

BOYLES, J. (*dissenting*). I am for affirmance. The only question in this case is whether Clarence E.

Mapes, deceased, was insolvent at the time of his death in December, 1937. In determining this, we are limited to his financial condition at the date of death instead of the date when the contract was entered into (1934), by the stipulation of counsel. The issue is purely a question of fact.

The guide for determining insolvency within the meaning of the fraudulent conveyance act has been established by statute (3 Comp. Laws 1929, § 13393 [Stat. Ann. § 26.882]):

"A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."

The issue thus narrows down to two questions: (1) What was the fair salable value of Mapes' assets at the time of his death; (2) What was the amount required to pay his probable liability on his existing debts at the time of his death.

1. Much testimony was taken as to the value of his assets. They were inventoried and appraised in his estate at $6,982.52. Subsequently some further assets were discovered and added. Also, there were some losses and deductions from the inventory and appraisal value. Subsequently discovered assets must be added, inventoried assets subsequently found to belong to someone else must be deducted. Evidence of gain or loss on sale of inventoried assets, and of appreciation or depreciation, has some probative value. Obligations of the estate subsequent to the date of death, such as expenses of administration, widow's selections and allowances, expenses of burial, monument or marker, are not debts of deceased at the date of death. From a full consideration of all the testimony adduced, after mak-

ing proper allowance for these matters, I am convinced that the original inventory and appraisal fairly represents the salable value of Mapes' assets at his death, $6,982.52. This is about $800 more than was actually realized, due to depreciation, delay, and many other causes.

2. The second question is, what were his debts at the date of death? The guide for determining the debts within the meaning of the fraudulent conveyance act is likewise established by statute (3 Comp. Laws 1929, § 13392 [Stat. Ann. § 26.881]):

" 'Debt' includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."

Plaintiff claims that when Mapes died, he owed $9,441.60. Defendant claims the amount owed by Mapes at that time is represented by the claims allowed in probate court, $6,976.70. The difference is $2,464.90. If any substantial portion of this difference is resolved in plaintiff's favor, Mapes was clearly insolvent; because the inventory and appraisal of his assets exceed the amount of claims allowed against his estate by only $5.82.

Plaintiff claims that when Mapes died, he owed the following obligations:

| | |
|---|---:|
| Shiawassee County Bank—note jointly and severally with Mr. Godfrey | $4,668.35 |
| Shiawassee County Bank—note | 1,855.70 |
| Doctor Bills | 519.25 |
| Hospital Bill | 31.70 |
| Martha Pierce Estate | 152.25 |
| R. A. Cummins—note | 2,000.00 |
| Interest on above note | 214.35 |
| Total | $9,441.60 |

The claims allowed in probate court were as follows:

Dr. Bates and Linden..................,...$  419.25
University Hospital ....................   31.70
Dr. Nesbitt ............................  100.00
Charles E. Godfrey..................... 2,417.80
Trustees of Segregated Assets of
   Shiawassee County Bank.............. 1,855.70
Martin A. Pierce......................  152.25
R. A. Cummins........................ 2,000.00
       Total ........................$6,976.70

A comparison of their respective claims indicates that the only substantial difference between plaintiff and defendant is the Godfrey note. Plaintiff claims Mapes owed the Shiawassee County Bank at the time of his death a note jointly and severally with Mr. Godfrey, amounting to $4,668.35. The defendant insists that the claim allowed Charles E. Godfrey, $2,417.80, correctly represents this item of indebtedness at time of death.

The cashier of the Shiawassee County Bank testified that this joint indebtedness was in the Shiawassee County Bank in 1931:

"*Q.* What was the indebtedness of Mr. Mapes to the Shiawassee County Bank at that time (1931)?

"*A.* The indebtedness consisted of $4,668.35, a note joint with Charles Godfrey, a $500 note, a $1,000 note, one $1,000 note and a $700 note."

This totals $7,868.35, and this testimony was not refuted. Mr. Mapes was obligated to the bank on notes amounting to $7,868.35 in 1931. Further questioned, the cashier further testified as follows:

"*Q.* What were his obligations to the Shiawassee County Bank, we will say, on January 1, 1934, or,

if you can tell me, in May, 1934, as to whether or not that indebtedness had been reduced any at that time?

"*A.* I might be able to tell you offhand. In 1934 he owed $7,868.35, which included the gross amount of a joint note with Mr. Godfrey in question. Sometime in 1932 he paid $254.92,—

"*Q.* I wish to interrupt. Was that upon principal?

"*A.* Yes. This information I am giving you is not correct, I am only tracing the particular note through that you subpoenaed me on, and I recall this covers the line. He did make some other small reduction, but it wasn't large, on some other notes.

"*Mr. Pulver:* This $235 you speak of, was that paid on the Godfrey note?

"*A.* There was never any paid on the Godfrey note.

"*Mr. Pulver:* This was paid on the other line?

"*A.* Yes.

"*The Court:* This was paid on the note which afterwards was put in as a claim.

"*A.* That is right. There were two notes made it up, originally it started with two; there was a $700 and a $1,000 note, and in this particular note which I was subpoenaed on and the $700 note remained the same; and the $1,000 note had $254.92 and $75 were paid upon that $1,700, at which time it went to the trust. Now, the reductions in the trust were something else.

"*Q.* You say it went in the trust. At what time was that? Fix the time so the court will know what time the trust took it over.

"*A.* This note was held under the substitution agreement and was later substituted to the trust, I think you are familiar with the substitution.

"*The Court:* Yes, I have had some experience along that line.

"*Witness:* This went to the trust December 26, 1933.

"*Q.* And at that time you say there was—the balance on this indebtedness was how much?

"*A.* It would be $1,370.

"*Q.* And at that time it was in the form of two notes?

"*A.* Two notes, and those note numbers—

"*Q.* We are not interested in the note numbers, as long as you have traced back the obligation to these two notes.

"*A.* Yes, that is right.

"*Q.* Mr. Teeters, can you tell me what other indebtedness Mr. Mapes owed at the Shiawassee County Bank in December of 1933 when these two notes were transferred over to the trust?

"*A.* Well, at that time he would still owe the Godfrey note, $4,668.35; that is joint with Mr. Godfrey. This was not a trustee note.

"*Q.* That was not a trustee note at that time?

"*A.* That was a joint note.

"*Q.* That was purely a note signed with Charles Godfrey?

"*Mr. Pulver:* It wasn't half and half, he was responsible for the whole note?

"*A.* We set up the entire responsibility there. I am giving it to you that way."

It is apparent from the foregoing that the note signed with Godfrey for $4,668.35 represented an obligation entirely separate from these other notes of Mr. Mapes that went into the trust. These other notes are represented by the claim filed and allowed, "Trustees of Segregated Assets of Shiawassee County Bank $1,855.70." The cashier further testified:

"*Q.* Now, at the time of his death what was his liability to the bank?

"*A.* Well,—

"*Q.* The testimony is—

"*A.* To the bank and this trust?

"*Q.* We will take them separately. We will take the liability to the bank and the liability to the trust.

"*A. He died when?*

"*Q. December 23, 1937.*

"*A. He still owed the Godfrey note. You see that was taken out in May 27, 1938,* up until that time.

"*The Court:* 1938?

"*Witness:* 1938.

"*Q. Up until that time, until May, 1938, the liability still existed on this note,* is that true, on this Godfrey note?

"*A. Yes.*

"*Q.* Was there any other liability to the *bank* or [on?] any of his indebtedness?

"*A.* No.

"*Q.* There was nothing else, *however, there was a liability to the trust?*

"*A. ·That is right.*"

The *bank* never filed a claim against the estate for the $4,668.35 note, although none of this indebtedness was paid by Mapes during his lifetime. The reason why is apparent from the record.

At the time of his death in December, 1937, Mapes was liable for the entire amount of the Godfrey note. Mr. Godfrey took up this joint note May 27, 1938, after the death of Mapes, filed a claim against Mapes' estate for contribution, and his claim was allowed, $2,417.80, being one-half of the Godfrey note, plus interest.

Mapes' liability on this note clearly made him insolvent at the time of his death. If any further indication of insolvency were necessary, the record clearly shows that Mapes was also liable for an unpaid balance of at least $600 on the land contract taken in the joint name of Mapes and wife. This was paid up by Mrs. Mapes.

It remains only to determine to what extent the claims of the unpaid creditors in whose behalf this bill was filed will not be paid out of the residue of the estate. All the assets have been disposed of and the widow's selections and allowances, administration expenses, claims having priority, have been paid. The final accounting of the administrator *de bonis non* has been allowed and the probate court has entered an order finding the residue on hand available to pay unpaid claims amounts to $2,518.65. The difference between this residue and the unpaid claims is over $3,000.

The court below, after considering the amounts invested by Mapes during his lifetime in payments of principal on the land contract, for improvements and remodeling the funeral home, found that Mapes had $2,000 thus invested therein. The record fully supports this finding. The deficiency in the residue of the estate for payment of claims exceeds that amount; therefore, appellant has no ground to complain of the amount of the lien established by the court below.

No other question of merit is raised by the appeal. There is no claim of homestead or dower and appellant has received her statutory rights in the estate.

The decree should be affirmed, with costs to appellee.