In re FOX HILL OFFICE INVESTORS, LIMITED, Debtor.

FOX HILL OFFICE INVESTORS, LIMITED, Plaintiff,

v.

MERCANTILE BANK, N.A., Defendant and Third-party Plaintiff,

v.

KROH BROTHERS DEVELOPMENT CO., Third-party Defendant.

Bankruptcy No. 87–01651–1–11.
Adv. No. 87–0396–1–11.

United States Bankruptcy Court, W.D. Missouri.

June 28, 1989.

Timothy Sear and Thomas Franklin, Kansas City, Mo., for plaintiff and third-party defendant.

David Wells and Linda Carroll Goyda, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION, AMENDED FINDINGS OF FACT

## CONCLUSIONS OF LAW, AND JUDGMENT

### INTRODUCTION

KAREN M. SEE, Bankruptcy Judge.

Plaintiff Fox Hill Office Investors (FHOI), debtor in the main proceeding, filed this adversary to invalidate a note and mortgage executed by its general partner Kroh Brothers Equity Company (KBEC) in favor of defendant Mercantile Bank, N.A. (Mercantile). The mortgage created a lien on the Fox Hill Office Building owned by FHOI. The First Amended Complaint is in three counts: Count I asks the Court to adjudicate the validity, priority and extent of Mercantile's lien on the Fox Hill Office Building; Count II asks the Court to adjudicate the validity and extent of the note; and Count III seeks to avoid the recording of the mortgage. Counts I and II are premised on KBEC's lack of authority to execute the note and mortgage. Count III is brought pursuant to 11 U.S.C. § 548.

Mercantile filed a third-party complaint against Kroh Brothers Development Com-

pany (KBDC)[1] asserting theories of recovery based on subrogation, subordination by agreement, and equitable subordination.

This Court entered its original Findings of Fact, Conclusions of Law and Judgment on July 29, 1988 after trial on the merits. The Court ruled in favor of FHOI on all counts of its complaint and in favor of KBDC on all counts of Mercantile's third-party complaint. The Court's opinion adopted, verbatim, the proposed findings and conclusions submitted by FHOI and KBDC. Mercantile appealed the decision.

On December 30, 1988 the district court remanded the decision to this Court. The district court's Order indicated that adoption of proposed findings and conclusions is not reversible error, *per se,* but would be if the trial court's reasoning is scarcely discernible or if it is impossible to tell that the trial court reviewed the record and the issues itself. The district court noted without explanation that the Court's oral statements made at the close of the evidence seem to contradict some written findings. Because the district court felt it was not clear that this Court had made its own careful consideration of the record, the case was remanded.

Upon additional and thorough review of the entire record, including its oral findings at trial, the Court now makes the following Amended Findings of Fact and Amended Conclusions of Law. To the extent that these Amended Findings and Conclusions contradict any oral comments or findings made on the record, these Amended Findings and Conclusions supersede those comments and findings.

## AMENDED FINDINGS OF FACT

FHOI is a limited partnership created under a limited partnership agreement dated December 1, 1982 (Partnership Agreement), and the laws of the State of Kansas. Plaintiff's Exhibit 1, Partnership Agreement. Mercantile Trust Company, N.A. (Mercantile), defendant and third-party plaintiff herein, is a national banking corpo-

ration headquartered in St. Louis, Missouri. KBDC, third-party defendant, was a Missouri corporation with its principal place of business located in Kansas City, Missouri. KBEC was the general partner of FHOI. Partnership Agreement at p. 1. KBEC is a wholly owned subsidiary of KBDC. KBEC was created by KBDC to serve as the general partner of certain limited partnerships.

At all times relevant to this lawsuit, FHOI owned an office building in Overland Park, Kansas, known as the Fox Hill Office Building. The only purpose of the partnership was to "engage in the business of acquiring, developing, owning, renting, maintaining and/or holding" a group of office buildings including the Fox Hill Office Building. Partnership Agreement § 3.01.

Kroh Brothers Realty Company (KBRC), not a party to this action, was a Missouri Corporation and a wholly owned subsidiary of KBDC. KBRC controlled the property management operations and commercial leasing aspects of KBDC. KBRC made tenant leasing and finish expenditures on behalf of the Kroh-related entities.

On the same date the partnership was formed KBDC and FHOI entered into a Partnership Supervisory Agreement, a Wraparound Promissory Note (Wrap Note) and a Wraparound Mortgage (Wrap Mortgage). The Partnership Supervisory Agreement provided that KBDC would assist and supervise KBEC in all aspects of the day-to-day operations of FHOI, including establishing FHOI's books and supervision of any manager selected by FHOI. Defendant's Exhibit L. Under the Partnership Supervisory Agreement, if KBEC failed to perform any of its duties as general partner of FHOI the limited partners could make demand, on written notice, that KBDC perform the obligations. The Wraparound Note, in the amount of $5,000,000, represented FHOI's cost of purchasing the office buildings. The underlying notes were made by KBDC to two other lenders in the aggregate amount of $3,200,000.

**1.** KBEC was a wholly owned subsidiary of KBDC. It and other entities related to KBDC are herein referred to as "Kroh related entities."

Also on that date FHOI entered into a Management Agreement with Kroh Brothers Management Company, also a Kroh-related entity.

In December, 1985, Jack Kroh was the Executive Vice President of KBEC. On November 5, 1985, Kroh requested from Mercantile "junior financing on Fox Hill Medical Building and Fox Hill Office Building" in the amount of $300,000. The cover letter for the loan request was written on KBDC letterhead and stated the purpose of the loan was to "recover some of the remodel and tenant finish funds that we have put into the properties to keep them high quality products." Mercantile understood that the purpose of the loan was to reimburse KBDC or KBEC for *past* advances on behalf of FHOI for building improvements, tenant improvements and other leasing expenses. The loan request also showed the past advances dated back to 1981, prior to the formation of the partnership.

The first page of the attached loan request lists the borrower as FHOI and KBDC as general partner. It also states that "[d]ue to the nature of the second mortgage loan ... we would prefer that this loan be unrecorded." Plaintiff's Exhibit 6. Mercantile knew that prior mortgage of Mutual Benefit Life Insurance Company (Mutual Benefit) required the consent of the mortgagee before any other financing could be placed on the property. The amount of the loan was to be $300,000, amortized over three years.

The loan request showed income of the Fox Hill Office Building at 95% occupancy was $698,444, less expenses of $239,274 leaving a net operating income of $450,170. The loan request showed debt service to the first mortgagee, Aetna, of $165,600, and to the second mortgagee, Mutual Benefit, of $238,000. This left a net cash flow of $46,475. Attached to the loan request was a schedule purporting to show expenditures for "building improvements, tenant improvements and other leasing expenses" since 1981 totalling $506,501.52. Also attached were "1985 Five–Year Projections" showing available cash flow in an amount

less than the amount necessary to service even the principal payments on the note for the years 1986 and 1987.

Mercantile's internal documents showed that the loan was to be repaid from "management fees earned and cash flow." Plaintiff's Exhibit 13. Jacqueline Rocchio, an assistant vice president of Mercantile in charge of the Kroh Brothers-related loans, testified that she knew the management fees referred to would not be earned by FHOI but by a Kroh-related entity. The Mercantile loan approval form showed quarterly principal payments of $25,000. Plaintiff's Exhibit 15. The note showed monthly interest payments at an annual rate of 12%. Plaintiff's Exhibit 2. According to the testimony of witnesses called by Mercantile, KBDC was obligated to fund any cash flow shortfalls of FHOI. *See also* Plaintiff's Exhibit 20. Based on these facts, the Court finds that Mercantile knew FHOI could not, from its own resources, repay the loan and that Mercantile knew the loan could make FHOI insolvent.

Jacob Mondschein, former controller of KBDC and Vice President of KBEC, executed the note and mortgage to Mercantile on behalf of FHOI on December 31, 1985. Plaintiff's Exhibits 2 and 3. Mercantile also obtained a Certificate of General Partner and Resolutions of the Board of Directors of KBEC, Defendant's Exhibits QQQ and PPP, in support of FHOI's authority to procure the loan. In addition to the mortgage, the loan was secured by an unsecured guarantee from KBDC. Plaintiff's Exhibit 21.

FHOI did not have its own bank account. Instead, it used the bank account of KBRC, the Kroh-related entity that made tenant finish expenditures for the Kroh partnerships, at Commerce Bank. Jacob Mondschein testified that payments made on behalf of FHOI were generally made out of a KBRC account at Commerce Bank. Money received by FHOI was placed into this account. Thus, it was most likely that any funds expended on tenant finish and improvements in the past for FHOI came from this account. Additionally, the Mercantile loan was kept on the books of

KBDC as an obligation of KBDC, not of FHOI (Defendant's Exhibit JJJ) and payments to Mercantile under the loan were charged against KBDC, not FHOI.

Rocchio, the Mercantile bank officer in charge of Kroh-related entities' loans, deposited the loan proceeds into a KBDC bank account at Mercantile on December 31, 1985 at the direction of Jena Garretson. Plaintiff's Exhibit 18. Garretson had been employed by the Kroh-related entities since 1974. In December 1985 her primary responsibilities included processing and closing of loans, including the Mercantile loan. She was directly supervised by John Kroh. For these reasons, the Court finds that FHOI did not receive the loan proceeds.

The evidence was abundant and conflicting concerning to which Kroh entities and in what amounts FHOI owed money. For example, the loan request states that $506,501.52 was spent on building improvements, tenant finishes and other leasing expenses from 1981 to the time of the request in 1985. It does not state which Kroh entity provided the funds for these improvements or which Kroh entity the loan proceeds would repay. Mondschein testified that he directed the compilation of these amounts for the loan request but did not know the source of the funds for these expenditures.

Additionally, the 1984, 1985 and 1986 tax returns for FHOI, Defendant's Exhibits WW, AAAA, and SSSS, show that improvements were made to the Fox Hill Office Building during those years. Line 16 of the tax returns show "other current liabilities" of $601,960 at the end of 1984, $1,028,597 at the end of 1985, and $1,167,810 at the end of 1986. A handwritten notation on the 1984 and 1985 tax returns indicates that the line 16 items in those years were designated as liabilities to the general partner, KBEC. Galvin testified that he had never seen any records to indicate that KBEC made any advances to FHOI. Thus, he did not believe KBEC would have loaned the partnership in excess of $1,000,000 by the end of 1985. Rather, the figure was probably obtained by combining and netting out all of the advances of the various Kroh entities, then reflecting them as one advance from the general partner.

Further, Defendant's Exhibit YY, p. 12, shows that FHOI owed KBRC $1,465,289.72, yet KBDC filed a proof of claim against FHOI that includes a similar amount, $1,490,000, for advances to the partnership. Galvin could not explain what transactions occurred to produce the debt to KBRC. He did, however, testify that KBRC would not have advanced funds to FHOI for tenant finishes or building improvements. According to Galvin, KBRC managed the residential marketing, property management and commercial leasing functions arm of the Kroh entities. Any funds advanced to FHOI by KBRC would most likely be to cover management fees and some of the operating expenses of the property such as electricity, repairs and maintenance.

Thus, although there was evidence that money had been spent on building improvements and tenant finishes for the Fox Hill Office Building, there were no records that any Kroh-related entity, including KBDC or KBEC, was owed any money by FHOI for building improvements, tenant improvements or other leasing expenses having to do with the Fox Hill Office Building. However, the books and records of FHOI showed that, to the extent available, charges for building improvements, tenant finish and other leasing expenses were charged against the account of FHOI and not against KBDC or KBEC.

Mercantile repeatedly urges the Court to find that regardless of who the loan proceeds were paid to, the evidence shows that FHOI received the benefit of the proceeds. However, there is no record of the loan proceeds being used for any expenditure made on behalf of FHOI. There was no evidence that any of FHOI's debts to any Kroh-related entity were reduced following the transfer of the loan proceeds from Mercantile to KBDC. Further, the evidence was not sufficient to indicate that FHOI owed KBDC anything in December, 1985. The evidence shows, instead, that KBDC

owed FHOI $561,683.77. Defendant's Exhibit JJJ, p. 171–72.

Moreover, the loan proceeds were not placed in an FHOI account or the KBRC account that FHOI used to collect money and pay bills. The most credible evidence concerning the probable use of the loan proceeds came from the testimony of Jacob Mondschein, former controller of KBDC and Vice President of KBEC. He testified that at the relevant points in time it would have been common for John Kroh to borrow money in the name of Kroh-related limited partnerships for the cash flow needs of KBDC and all other Kroh-related entities. He also testified that it would not have been unusual for the purpose of the Mercantile loan to have been to provide cash flow for KBDC. Therefore, regardless of Mercantile's contentions and regardless of which Kroh-related entities FHOI was indebted to, there is simply no evidence to support a finding that FHOI ever received the loan proceeds or that the loan proceeds were ever used to benefit the partnership or reduce a partnership debt to another Kroh-related entity. There is at least a preponderance of the evidence that the loan proceeds were used to meet the cash flow needs of KBDC. Accordingly, the Court is compelled to find that the loan proceeds were used to meet the cash flow needs of KBDC and that FHOI did not receive the benefit of the loan proceeds.

Mercantile also contends that the Partnership Agreement expressly authorized KBEC to execute the note and mortgage and bind FHOI. The Partnership Agreement contains provisions prohibiting the following actions and transactions. First, FHOI could not finance or refinance the Fox Hill Office Building if the financing or refinancing made the limited partners personally liable. Partnership Agreement at §§ 3.02(b) and 7.08. Thus, the Partnership Agreement prohibited recourse notes. Mercantile does not dispute, and the Court finds, that the note is a recourse note because it failed to limit liability on the note solely to the Fox Hill Office Building. Sec-

ond, although the Partnership Agreement allowed KBEC to "make or cause to be made temporary loans" to FHOI and to "repay such loans at any time," it prohibited repayment of such loans unless the limited partners' adjusted capital contribution, defined in § 1.16 of the Agreement, was reduced to zero. Partnership Agreement at § 5.05. There was no evidence that the limited partners' capital contributions had been completely repaid. Finally, the Partnership Agreement prohibits the commingling of partnership monies with those of any other entity. Partnership Agreement at § 10.05. At the time the loan was made, Mercantile had in its possession a copy of the Partnership Agreement and therefore had notice of these provisions.

In addition to notice of the contents of the Partnership Agreement, Mercantile also had a title insurance commitment relating to the Fox Hill Office Building. The title insurance commitment would have made Mercantile aware of the Wrap Note and Wrap Mortgage, but it also had copies of those documents. Rocchio, Mercantile's officer in charge of Kroh-related entities' loans, testified that at the time Mercantile made the loan she thought that Mercantile "could" have had a third mortgage on the property had they recorded at the time of the transaction.[2] However, Rocchio also admitted that a recording at the time of the loan would not have made Mercantile prior to KBDC absent further action on the part of Mercantile. Rocchio relied on Mercantile's attorney to determine the necessity of such further action. Mercantile would have made sure that the Wrap Note and Mortgage were subordinate to Mercantile's note and mortgage had it been advised to do so by its attorney.

A significant piece of evidence is Rocchio's testimony that at the time the loan was approved Mercantile was aware that FHOI did not have sufficient cash flow to repay the loan. Instead, Mercantile was looking to KBDC for repayment of the loan and took an unsecured guaranty from KBDC as security for the loan.

2. This was a correction of her January 22, 1987, memo in which she state that Mercantile

"would" have had a third mortgage had they recorded at the time of the transaction.

Finally, Rocchio testified she was aware that the Mutual Benefit mortgage prohibited FHOI from executing another mortgage on the Fox Hill Office Building without Mutual Benefit's consent and that Mercantile considers it a serious breach of a loan agreement when a borrower violates the terms of a promissory note and mortgage by executing a subsequent mortgage without the approval of Mercantile. She understood that the execution of unrecorded mortgages prevented other creditors from determining the true financial condition of the debtor.

Concerning the limited partner's knowledge of the transaction, there was no evidence that the limited partners ever consented, in writing or otherwise, to the Mercantile note and mortgage. There was not even evidence of the identity of the limited partners at any time after December 31, 1985. Additionally, Mercantile had no contact with any of the limited partners prior to entering into the loan. Although Mercantile contends that the limited partners should have known about the note and mortgage, there was insufficient evidence to support a finding for the following reasons.

First, the general ledger of FHOI for the months of January, February, and March of 1986, Defendant's Exhibit CCCC, does not show any payment by FHOI on the note. Any references to an account with Mercantile were explained by Galvin as intercompany "memo posts" designed, in this instance, to give the partnership the credit for any interest payments that would have been made. The innocuous references to the Mercantile account in Exhibit CCCC are not sufficient to put the limited partners on notice of the note and mortgage even if they or their representative had access to them.

Second, although the title insurance policy, Defendant's Exhibit RRRR, names Mercantile as mortgagee, it fails to show that any limited partner or other party related to FHOI was responsible for naming Mercantile as a mortgagee or was a loss payee under the policy. Garretson, the Kroh employee responsible for closing the loan, testified that to her knowledge Cohen & Company, the named loss payee, was not a limited partner. Additionally, the testimony of defendant's witness Bob Shapiro indicated that the named insured under the policy, Equity Analysts, was not involved with or related to FHOI. Shapiro is a general partner in Realty Consultants, the entity that assisted in the syndication of FHOI. Although he is also a general partner in Equity Analysts, Shapiro testified that Realty Consultants, not Equity Analysts, represented the limited partners of FHOI at least at the time the partnership was formed. Thus, the title insurance policy is not proof that the FHOI limited partners were aware of the note and mortgage.

Finally, the Court finds that Mercantile returned the Wrap Note and Wrap Mortgage to KBDC on June 9, 1986. Mercantile recorded its mortgage on December 8, 1986. At the time Mercantile recorded its mortgage, it was aware of KBDC's severe financial problems but had no knowledge regarding the financial condition of FHOI. Upon recordation, Mercantile transferred no property or consideration to FHOI or any other Kroh-related entity. FHOI filed bankruptcy on April 15, 1987.

## AMENDED CONCLUSIONS OF LAW

This Court has jurisdiction of the parties and the subject matter of this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105, 544 and 548. Venue is proper pursuant to 28 U.S.C. § 1409.

### I. Actual Authority

Mercantile contends that KBEC had actual authority to execute the note and mortgage because both were for a proper partnership purpose and because the transaction was expressly authorized by the Partnership Agreement. The Partnership Agreement, by its terms, is to be construed according to Kansas law.

The burden of proof is on the party claiming the agency relationship. *In re Branding Iron Motel, Inc. (Branding Iron Motel v. Sandlian Equity, Inc.)*, 798 F.2d 396, 401[8] (10th Cir.1986). The agen-

cy relationship must be established by clear and satisfactory evidence. *Id.* Under Kansas law, an agent's actual authority may be either express or implied. *Theis v. DuPont, Glore Forgan, Inc.*, 212 Kan. 301, 510 P.2d 1212[8] (1973). An express agency exists "if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act." *Mohr v. State Bank of Stanley*, 241 Kan. 42, 734 P.2d 1071, 1075[3] (Kan. 1987), *quoting Shawnee State Bank v. North Olathe Industrial Park, Inc.*, 228 Kan. 231, 613 P.2d 1342 (1980). Therefore, in determining the existence of actual authority only the authority delegated by FHOI to KBEC and the *actual* use of the loan proceeds is relevant. Representations made by KBEC or KBDC to Mercantile regarding the purpose of the loan are not relevant in determining KBEC's actual authority. Instead, the inquiry must focus on whether FHOI expressly authorized KBEC's actions when KBEC mortgaged the Fox Hill Office Building as security for a recourse note, commingled the proceeds with funds of other entities, and allowed the loan proceeds to be used to meet the cash flow needs of KBDC.

■ Mercantile is correct in its assertion that the Partnership Agreement permitted borrowing to finance *current* tenant finish and improvement projects. However, the loan proceeds were not used for this purpose. Mercantile is also correct in pointing out that § 5.05 of the Partnership Agreement permitted repayment of temporary loans made or caused to be made by KBEC on behalf of FHOI. However, the loan proceeds were not used for this purpose and the circumstances necessary for repayment had not occurred. What Mercantile's arguments fail to recognize is that the loan proceeds were actually used to meet KBDC's cash flow needs.[3] Mercantile does not contend, and there is no indication in the Partnership Agreement, that FHOI was formed so its assets could be used to obtain cash flow for the parent corporation of its general partner. Further, FHOI did not receive the loan proceeds or the benefit of the loan proceeds.

Based on these findings and conclusions, the Court must conclude that the note was not made for a partnership purpose.[4] Because FHOI did not receive the loan proceeds or the benefit of the loan proceeds, the Court further concludes that FHOI gave no consideration for the note and therefore no consideration for the mortgage. Accordingly, the Court concludes that the mortgage was not made for a partnership purpose. The conclusions that neither the note nor the mortgage were made for a partnership purpose, standing alone, preclude any conclusion that KBEC had actual authority to make the note and mortgage the Fox Hill Office Building.

■ However, in addition to the fact that the note and mortgage were not made for a partnership purpose, the transaction was in further contravention of the Partnership Agreement in the following respects. The note was a recourse note, thereby making the limited partners personally liable, in contravention of §§ 3.02(b) and 7.08 of the Partnership Agreement. The loan proceeds were commingled with funds of an-

---

3. Viewing the evidence in the light most favorable to Mercantile, even if the loan was for *past* tenant finish, the purpose to reimburse KBDC for *past* tenant finish, dating back to 1981, is simply another way of saying the purpose of the loan was to help KBDC's cash flow, and therefore it was not for any partnership purpose of FHOI.

4. Mercantile has asserted that this Court specifically found in its oral findings that if the loan proceeds were for tenant finishes they were for a proper partnership purpose. In reviewing the transcript, what the Court said was:

> [T]here's no question that to do tenant finish would benefit the partnership. But it's as to whether the loan to pay for past tenant finishes benefitted the partnership. It's not a question as to whether tenant finish benefitted the partnership because the loan wasn't for tenant finish.

Transcript Vol. II at p. 254. Actually, this section is not part of the Court's oral findings. However, in its oral findings the Court specifically stated that one of the questions in the case was whether it would be a partnership purpose to pay money to KBDC to reimburse a partnership obligation. Transcript Vol. II at p. 266. These Amended Conclusions of Law should serve to clarify any inconsistency perceived by Mercantile.

other entity in contravention of § 10.05 of the Partnership Agreement. Finally, even if the loan could be characterized as the repayment of a temporary loan pursuant to § 5.05, as explained earlier, such repayment was not authorized at the time the note and mortgage were executed. Based on these conclusions, the Court further concludes that KBEC did not have express actual authority to make the loan and mortgage the Fox Hill Office Building.

■ Mercantile contends that certain provisions of the Partnership Agrement gave KBEC express actual authority to make the note and mortgage the Fox Hill Office Building. First, Mercantile contends that § 7.08 of the Partnership Agreement provided KBEC with express actual authority because it allowed KBEC to "modify, recast, alter and refinance any indebtedness affecting [the Fox Hill Office Building], and to encumber [the Fox Hill Office Building] with any other indebtedness ... superior or inferior to such existing financing." However, Mercantile's contention disregards the portion of that section stating that "[n]otwithstanding anything herein to the contrary, any such modification, financing or refinancing of indebtedness affecting [the Fox Hill Office Building] shall not cause the Limited Partner to become personally liable thereon...." The Court previously found that the note was a recourse note and therefore made the limited partners personally liable and previously concluded that, as such, the note was in contravention of the Partnership Agreement. Accordingly, the Court further concludes that § 7.08 did not expressly authorize KBEC to make the recourse note to Mercantile.

■ Second, Mercantile relies on § 7.02 of the Partnership Agreement. That section gave KBEC power to take all action necessary for the maintenance or operation of the Fox Hill Office Building, assure that the Fox Hill Office Building was properly maintained, execute refinancing documents, and to do any other acts necessary to the partnership's business. However, the loan proceeds were not used to maintain or operate the Fox Hill Office Building

but were used to provide cash flow to KBDC. Further, that section is expressly made subject to the provisions of Article VII of the Partnership Agreement. The Court concluded above that the note was in contravention of § 7.08. Finally, the Court has previously concluded that the note and mortgage were not for a partnership purpose. Therefore, KBEC's execution of the note and mortgage was not in furtherance of the partnership's business. For these reasons, the Court concludes that § 7.02 did not authorize KBEC to make the note and mortgage.

■ Third, Mercantile relies on §§ 3.01 and 3.02 of the Partnership Agreement because those sections expressly provide that tenant finish and improvement expenses for the Fox Hill Office Building are purposes consistent with the terms of the Partnership Agreement. First, these sections apply only to expenses for current tenant finishes and improvements. They are not relevant to KBEC's authority to repay expenditures for past tenant finishes and improvements. Second, even if these sections were relevant, the Court's inquiry in determining express actual authority is confined to consideration of the authority conferred on KBEC and whether KBEC's actions were within the bounds of that authority. Representations to Mercantile concerning the use of the loan proceeds are irrelevant. Here, the loan proceeds were not used for either current tenant finish and improvement expenses or to repay such past expenses. The loan proceeds were used to provide cash flow to KBDC. Accordingly, the Court further concludes that neither § 3.01 nor § 3.02 provide authority for KBEC's transaction with Mercantile.

■ Finally, Mercantile relies on § 7.09 of the Partnership Agreement. That section gave KBEC a power of attorney coupled with an interest to execute on behalf of the limited partners any documents necessary to refinancing or any "other transaction." However, Mercantile again disregards the fact that the power of attorney was given to assist in refinancing pursuant to § 7.08 or "any other act by the General Partner which is taken in accordance with"

the provisions of the Partnership Agreement. The Court has previously concluded that the provisions of § 7.08 were not complied with and that the transaction was not otherwise "in accordance with" the Partnership Agreement. Accordingly, the Court further concludes that § 7.09 did not authorize KBEC to make the note or mortgage.

■ Even if KBEC's actions were authorized by the Partnership Agreement, KBEC's actions violated K.S.A. § 56–130. That section provides:

A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that *without the written consent or ratification of the specific act by all the limited partners*, a general partner or all of the general partners have no authority to

(a) Do any act in contravention of the certificate,

\* \* \* \* \* \*

(d) Possess partnership property, or assign their rights in specific partnership property, for other than a partnership purpose[.]

K.S.A. § 56–130 (repealed 1983) (emphasis added). These provisions are unambiguous and absolute and the acts proscribed may not be changed by agreement of the partners. *Compare* K.S.A. § 56–130(f) and (g) *with* K.S.A. § 56–130(a), (b), (c), (d) and (e). Rather, specific written consent or ratification by the limited partners of the act proscribed in K.S.A. § 56–130(a) and (d) . must be obtained..

A certificate of limited partnership must state the character of the partnership's business. K.S.A. § 56–123 (repealed 1983). According to the Partnership Agreement, the business of FHOI would not have been for its assets to serve as security for a corporate entity related to its general partner. Thus, the note and mortgage were in contravention of K.S.A. § 56–130(a). Additionally, the mortgage was not given for a partnership purpose and therefore was in contravention of K.S.A. § 56–130(d). Because the transaction was in violation of

the statute, KBEC could not have had express actual authority to make the note and mortgage.

Accordingly, based on all of the above conclusions, the Court holds that KBEC had no express actual authority to make the note and mortgage the Fox Hill Office Building.

■ Kansas law also looks to whether there is actual authority under an implied agency. An implied agency "is based on an implied intention to create an agency. It arises upon facts for which the *principal* is responsible." *State Bank of Stanley,* 734 P.2d at 1076[8] (emphasis added), *quoting* 2A C.J.S. *Agency* § 52, p. 626. "[I]t is the manifestation of the alleged principal and agent as between themselves that is decisive, and not the appearance to a third party or what a third party should have know." *Id.* Here, there was no evidence that FHOI at any time prior to the execution of the note and mortgage impliedly intended for KBEC to do acts in violation of the Partnership Agreement. Accordingly, the Court further concludes and holds that KBEC had no implied actual authority to make the loan and mortgage the Fox Hill Office Building.

## II. *Apparent Authority*

■ Mercantile next contends that KBEC had apparent authority to make the note and mortgage the Fox Hill Office Building. In support of its contention, Mercantile relies on the broad grant of apparent authority to KBEC found in the Partnership Agreement:

The General Partner shall have exclusive authority to manage the operations and affairs of the Partnership and to make all decisions regarding the business of the Partnership. Persons dealing with the Partnership are entitled to rely conclusively on the power and authority of the General Partner as set forth in this Agreement. *In no event shall any person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to*

# 1018

*ascertain that the terms of this Agreement have been complied with,* or be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative; and every contract, agreement, deed, mortgage, security agreement, promissory note or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every person relying thereon or claiming thereunder that (i) at the time of the execution and/or delivery thereof, this Agreement was in full force and effect, (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership, and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

Partnership Agreement at § 7.01. Mercantile contends that that provision gave KBEC an unlimited reservoir of apparent authority and excused Mercantile from ascertaining the extent of KBEC's authority. Mercantile relies on the decision in *Mist Properties, Inc. v. Fitzsimmons Realty Co., Inc.,* 228 N.Y.S.2d 406 (N.Y.Sup. Ct.1962).[5] This Court disagrees with Mercantile's contention.

It is true that apparent agency is based on "intentional actions or words of the principal toward third parties which reasonably induce or permit third parties to believe that an agency relationship exists." *State Bank of Stanley,* 734 P.2d at 1076[6]. However, when a third party

knows, or has good reason for believing that the acts exceed the agent's powers, or if such reasonable inquiry as he is under the duty to make, would result in a

discovery of the true state of the powers, and he fails to fulfill that duty, he cannot assert an apparent authority effective against the principal.

*Anheuser–Busch v. Grovier–Starr Produce Co.,* 128 F.2d 146, 153[11] (10th Cir. 1942). *See also In re West Tech, Ltd. (West Tech, Ltd. v. Boatmen's First National Bank of Kansas City, N.A.),* Adv. No. 87–0365–1–11, Slip Op. at p. 9, (Bankr.W.D.Mo. June 3, 1988) (under analogous facts bank was required to show that circumstances were not such as to put them on inquiry that the agent has or might be breaching its duties to its principal), *aff'd* No. 88–0593–CV–W–3, (W.D.Mo. Nov. 23, 1988) (pending on appeal to the Eighth Circuit Court of Appeals).

Here, the loan request was made on KBDC letterhead and stated that the borrowers were to be KBDC, not the general partner KBEC, and FHOI. The Partnership Agreement gave Mercantile the knowledge that partnership loans could not make the limited partners personally liable and therefore had to be non-recourse. It also put Mercantile on notice that partnership funds could not be commingled with funds of other entities and expressly stated that certain preconditions had to be met before any "temporary loans" could be repaid.

Although Mercantile has repeatedly argued throughout its briefs and in its proposed Findings and Conclusions that the purpose of the loan was to finance tenant improvements, the loan request indicates that the loan proceeds were to repay a previous loan from KBDC for tenant improvements dating back to 1981. Mercantile understood that the loan was to *reimburse* a Kroh-related entity for prior expenditures on Fox Hill Office Building tenant finishes and improvements. *See* "Proposed Findings of Fact and Conclusions of Law Mercantile Bank National Association," Doc. No. 68, p. 8–9. Under the Part-

---

**5.** The Court notes that Mercantile cited § 7.01 and the *Mist Properties* decision in conjunction with its argument that KBEC had actual authority to make the mortgage and note. In this Court's opinion, § 7.01 is more appropriately considered in conjunction with an inquiry into KBEC's apparent authority because that section encompasses manifestations from the principal to third persons, not to its agent, KBEC.

nership Agreement the nature of such a transaction is completely different from a transaction involving the financing of current improvements. Mercantile had knowledge that the two types of transactions were treated differently in the Partnership Agreement.

Further, in *Anchor Centre Partners, Ltd. v. Mercantile Bank, N.A.*, No. WD 40696, slip op. at 25, 1989 WL 58725 at 28 (Mo.App.W.D. June 6, 1989), a suit involving this defendant and a partnership provision identical to § 7.01, the court held that "Mercantile [was] precluded from relying on the doctrine of apparent authority" because it had received partnership documents describing the terms and conditions for partnership loans. The court based its decision on the authority that "[o]ne who deals with an agent knowing that he is clothed with a circumscribed authority and that the agent's act transcends his powers cannot hold the principal liable for the act." *Id.* The *Anchor Centre* decision is directly on point insofar as it held that Mercantile cannot rely on § 7.01 for KBEC's authority when it had in its possession documents indicating that the transaction was outside the scope of KBEC's apparent authority.

Mercantile also argues that mere technical violations of the Partnership Agreement should not be sufficient to give it notice that KBEC lacked authority in view of the broad grant of authority in § 7.01. It contends that it should not be responsible for policing the Partnership Agreement. The Court, however, concludes that Mercantile was aware of facts involving more than technical violations of the Partnership Agreement sufficient to put it on inquiry notice.

First, Mercantile also knew that FHOI did not have sufficient cash flow to repay the loan and therefore that the loan could make FHOI insolvent. This would make it impossible to carry on the business of the partnership in contravention of K.S.A.

§ 56–130(b).[6] Second, one of the borrowers and general partner was originally stated as KBDC. However, before the loan closed, Mercantile knew that the general partner was KBEC, that the loan proceeds were meant to reimburse KBDC or another Kroh entity and that the loan proceeds were not to be placed in an FHOI account. Third, Mercantile knew that it was taking an unrecorded mortgage and that a prior mortgagee did not allow subsequent mortgages without the prior mortgagee's consent.

These facts, alone, should have led Mercantile to inquire whether KBEC had authority to make the note and mortgage or was breaching its duties to FHOI by entering into the loan and mortgaging the Fox Hill Office Building. *In re West Tech, Ltd. (West Tech, Ltd. v. Boatmen's First National Bank of Kansas City, N.A.)*, Slip Op. at p. 9–10. For these reasons, the Court concludes that Mercantile had sufficient knowledge of the irregularity of this transaction to be put on notice that it should inquire further concerning the authority of KBEC to make the note and mortgage the Fox Hill Office Building. Mercantile did not do so. Accordingly, Mercantile did not act in good faith and cannot justifiably rely on § 7.01 of the Partnership Agreement as the basis for KBEC's authority.

Additionally, KBEC's actions violated K.S.A. § 56–130(a) and (d). Absent the required consent or ratification "there can be no such thing as apparent authority to act in contravention of the statute." 59A Am. Jur., *Partnership* § 1331 (1987).

Based on the above, the Court concludes and holds that KBEC had no apparent authority to make the note and mortgage the Fox Hill Office Building.

### III. Ratification

■ Mercantile contends that the limited partners of FHOI were negligent be-

---

**6.** In conjunction with this conclusion, the Court notes that the actual state of FHOI's financial affairs is irrelevant in determining Mercantile's knowledge of those affairs at the time of the loan because Mercantile never investigated FHOI's finances when it made the loan. Therefore, in making its determination of KBEC's apparent authority, the Court gives no weight to the evidence adduced by Mercantile that FHOI was insolvent prior to the loan.

cause they did not review partnership books and records, gave KBEC a broad grant of authority, and failed to police KBEC's actions. Mercantile further contends that the broad grant of authority to KBEC in § 7.01 of the Partnership Agreement and the fact that the general partner is given sole control of the business should be construed as an abdication by the limited partners of their actual authority. This abdication, in turn, should be construed as FHOI's acknowledgment and ratification of the note and mortgage. Mercantile cites no authority in support of these contentions and the Court's research has not revealed any decisions in which contributory negligence has been held *per se* to support a finding of ratification. Accordingly, the Court concludes that any alleged negligence on the part of the limited partners in investing in FHOI or in overseeing their investment is irrelevant to an inquiry whether the limited partners ratified the transaction.

Mercantile also contends that the limited partners knew or should have known of the transaction and their failure to repudiate the transaction indicates their ratification of the note and mortgage. "Ratification is the adoption or confirmation by a principal of an act performed on his behalf by an agent which act was performed without authority." *Brown v. Wichita State University*, 217 Kan. 279, 540 P.2d 66, 75[7] (1975) *portion cited reaffirmed and other portions vacated* 219 Kan. 2, 547 P.2d 1015 (1976). "Knowledge of the unauthorized act is essential for the principal to ratify the act, *and must be shown or facts proved that its existence is a necessary inference therefrom.*" 540 P.2d at 75[9].

■ There is no direct evidence that the limited partners knew of the transaction. The only evidence from which the limited partners' knowledge of the transaction might be inferred do not support a "necessary inference" that they knew of the transaction. The Court previously concluded that the title insurance policy is not proof that the FHOI limited partners were aware of the note and mortgage because FHOI was not related to any entity named on the policy so as to impute any of that knowledge to the limited partners of FHOI. The Court also found that the limited partners are not charged with notice of the books and records of KBDC and that Defendant's Exhibit CCC does not contain sufficient information to put the limited partners on notice of the note and mortgage. Finally, there was no indication in any of the FHOI general ledgers admitted into evidence that payments on the Mercantile note were charged against FHOI.

For these reasons, the Court concludes that the limited partners of FHOI did not have sufficient, if any, knowledge of the unauthorized transaction so as to hold they ratified the transaction. Accordingly, the Court concludes the limited partners of FHOI did not ratify the note and mortgage.

The limited partners' lack of knowledge also precludes a finding that they ratified the transaction because they failed to repudiate it. "Upon acquiring knowledge of his agent's unauthorized act, the principal should promptly repudiate the act, otherwise it will be presumed he has ratified and affirmed the act." *Brown v. Wichita State University*, 540 P.2d at 75[8]. The principal's knowledge of the transaction is a prerequisite to ratification of a transaction by the principal's failure to repudiate. There is no evidence that the limited partners had knowledge of the transaction. Accordingly, the Court concludes and holds that the limited partners of FHOI did not have sufficient knowledge of the transaction to require ratification or ratification in the absence of repudiation.

Because KBEC did not have actual or apparent authority to execute the note and mortgage and because the limited partners did not ratify the transaction, the Court holds that FHOI is not bound by the Mercantile promissory note and mortgage.

## IV. Fraudulent Conveyance

■ KBDC seeks the avoidance of the recording of the mortgage pursuant to 11 U.S.C. § 548. That section provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property,

or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

\* \* \* \* \* \*

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

\* \* \* \* \* \*

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce an obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(a), (c). Mercantile recorded the mortgage on December 8, 1986, within one year of FHOI's bankruptcy filing on April 15, 1987. Accordingly, the Court concludes that a transfer of property in which FHOI had an interest occurred within one year of the filing of FHOI's petition in bankruptcy. FHOI received no consideration for the note and therefore no consideration for the mortgage. Thus, FHOI did not receive "reasonably equivalent value" for the recordation of the mortgage. Mercantile has not disputed that FHOI was insolvent on the date it recorded the mortgage. For these reasons, the Court concludes that the elements of § 548(a)(2) have been met. Accordingly, the Court holds that the recordation of the mortgage is avoided pursuant to 11 U.S.C. § 548.

Because the mortgage, after avoidance pursuant to § 548, was unrecorded on the date FHOI filed for bankruptcy, the Court further concludes that the mortgage was unperfected on that date as to FHOI, and holds that the mortgage should be avoided pursuant to 11 U.S.C. § 544. Based on these conclusions and holdings, the Court further holds that the Mercantile mortgage should not be enforceable against FHOI.

## V. Contractual Subordination

 In its third-party complaint against KBDC, Mercantile seeks subordination by agreement of KBDC's claim under the Wrap Note and Wrap Mortgage to Mercantile's claims under its note and mortgage. Contractual subordination under the Bankruptcy Code is governed by § 510(a), which provides:

(a) A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

11 U.S.C. § 510(a).

Mercantile contends that KBDC agreed to subordinate the Wrap Note and Wrap Mortgage to subsequent mortgages or security agreements executed by KBDC. Mercantile further contends it relied on this provision in extending the loan and taking the mortgage and can enforce the provision as a third-party beneficiary of the agreement. In support of these contentions, Mercantile relies on the following provision of the Wrap Note:

(1) The notes associated with the following Mortgages are hereinafter collectively referred to as the "Prior Mortgage Notes":

\* \* \* \* \* \*

(c) Such Mortgage or other security instrument as may hereafter be placed of record by the holder of this Note, as security for indebtedness incurred by the holder of this Note[.]

Plaintiff's Exhibit 4 at p. 2. Mercantile interprets this provision as subordinating KBDC's rights against FHOI under the Wrap Note and Wrap Mortgage to Mercantile's rights under the mortgage and note.

This Court disagrees with Mercantile's interpretation of the above provision for the following reasons. First, the provision does not apply to both the notes and the mortgages enumerated, as argued by Mer-

cantile. The section clearly provides that the notes secured by the mortgages, not the mortgages, themselves, are affected by the provision.

Second, subsection (c) of the provision refers to notes associated with mortgages placed of record by the *holder* of the Wrap Note to secure an indebtedness of the *holder* of the Note. There was no evidence to indicate that any entity other than KBDC was the holder of the Wrap Note after June 9, 1986. KBDC did not record the mortgage on the Fox Hill Office Building; Mercantile did. There is no evidence—nor does Mercantile outwardly contend—that the indebtedness on the Mercantile note was KBDC's.

Third, there is no evidence that Mercantile negotiated subordination of the Wrap Note and Wrap Mortgage in extending the loan. Rather, the evidence is to the contrary. Rocchio's testimony shows that she knew even if Mercantile had recorded its mortgage at the time of the loan it would not necessarily have been prior to the Wrap Note and Mortgage. Rocchio also indicated that had Mercantile's attorney told Mercantile that it was not prior, Mercantile would have taken steps to ensure subordination of the Wrap Note and Wrap Mortgage to Mercantile's note and mortgage. Accordingly, the Court concludes that there was no subordination agreement between KBDC and Mercantile and therefore subordination pursuant to § 510(a) is inappropriate.

## VI. Equitable Subordination

■ Mercantile also seeks to subordinate KBDC's claims under the Wrap Note and Wrap Mortgage to Mercantile's claims under its note and mortgage on equitable grounds. A creditor's claim may be subordinated to the claims of debtor's other creditors under the equitable powers of the bankruptcy court as set forth in 11 U.S.C. § 510(c)(1). *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft)*, 850 F.2d 1275, 1281–82 (8th Cir.1988). Section 510(c)(1) provides that the court may, after notice and a hearing "under principles of equitable subordination, subordinate for purposes of distribu-

tion all or part of any allowed claim to all or part of another allowed claim...." 11 U.S.C. § 510(c)(1).

Section 510(c)(1) does not permit subordination absent an allowed claim. Therefore, by definition, Mercantile's claim for equitable subordination must fail. This Court has determined that Mercantile's note and mortgage are not binding on FHOI. *See* Amended Conclusions of Law 36 and 43. Accordingly, the Court further concludes that Mercantile has no "allowed claim" in FHOI's bankruptcy proceeding within the meaning of § 510(c)(1) to which the claim of KBDC may be subordinated.

Even assuming that Mercantile had a claim for the purposes of § 510(c)(1), it has not shown facts warranting subordination. The Eighth Circuit recently set forth the three-part test for determining whether equitable subordination is appropriate:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

*Bellanca Aircraft*, 850 F.2d at 1282. Additionally, this Court must also be guided by the rule that any attempt to adjust equities between a junior and senior creditor, such as KBDC and Mercantile, must be "scrupulously measured and fitted to the actual injury that has been done or the unjust enrichment that is involved." *In re Kansas City Journal–Post Co.*, 144 F.2d 791, 801[7] (8th Cir.1944). The bankruptcy court

must have a sound regard for the distribution results that will be produced to the creditor whose claim is being subordinated, as well as to the other creditors. It should not operate to take away anything punitively to which one creditor is justly entitled ... and bestow it upon others, who ... have no fair right to it.

144 F.2d at 800–01[6].

Regardless of whether the first and third elements are met, the second element has

not been met. The Court previously found that Mercantile was not looking to FHOI for repayment but instead was looking to the unsecured credit of KBDC. As this Court has concluded, Mercantile must now look only to the unsecured credit of KBDC for repayment. As plaintiff points out, Mercantile has not been injured but, in fact, is getting exactly what it bargained for. Thus, Mercantile has "no fair right" to a position prior to KBDC.

■ Additionally, a party such as Mercantile must have "clean hands" to seek relief from a court of equity:

> The clean hands doctrine is based upon the maxim of equity that he who comes into equity must come with clean hands. It provides in substance that no person can obtain affirmative relief in equity with respect to a transaction in which he has, himself, been guilty of inequitable conduct. (citation omitted).

*Fuqua v. Hanson,* 222 Kan. 653, 567 P.2d 862, 866[6] (1977). Subordination cases have held that inequitable conduct includes the intentional nondisclosure of indebtedness and delay on the part of a lender in perfecting a security interest. *In re Beverages International, Ltd.,* 50 B.R. 273, 282 (Bankr.Mass.1985). In this case, Mercantile withheld its mortgage from recordation knowing that Mutual Benefit's prior mortgage did not allow subsequent mortgages absent the prior mortgagee's consent. Mercantile considers it a serious breach of a loan agreement when a borrower violates the terms of a promissory note and mortgage by executing a subsequent mortgage without its approval. Such action to conceal Mercantile's mortgage from a prior mortgagee, which action Mercantile condemns when it holds a senior mortgage, constitutes "inequitable conduct" on Mercantile's part which, standing alone, precludes equitable relief.

Finally, § 510(c)(1) prohibits this Court from advancing any interest of Mercantile, whether by subrogation or subordination. Section 551 preserves the avoided transfer or lien of Mercantile to the estate. That section also operates to prevent any purported creditor, such as Mercantile, from improving its position at the expense of the estate. A decision by this Court to allow Mercantile to improve its position would be inequitable to unsecured creditors of FHOI because it would allow Mercantile to share in an estate which it did not intend to bind. For these reasons, the Court concludes and holds Mercantile's claim under the note and mortgage should not be equitably subordinated to KBDC's claim under the Wrap Note and Wrap Mortgage.

*VII. Subrogation*

■ Finally, Mercantile contends that it should be subrogated to the lien of KBDC under the Wrap Mortgage. Under Kansas law the theory of subrogation "is inapplicable until and unless defendants have paid a debt for which another is primarily responsible and such payment must generally be in full discharge of that party's obligation. Mere liability to pay is not ordinarily enough for one to be substituted to the rights of the creditor." *Federal Savings & Loan Insurance Corporation v. Huff,* 237 Kan. 873, 704 P.2d 372, 380[17] (1985). In its Amended Findings of Fact, the Court found that there was no evidence of a debt between KBDC and FHOI in December, 1985. The Court also found that no debt from FHOI to any Kroh-related entity was reduced as a result of the transfer of the loan proceeds to KBDC. These findings preclude a conclusion that Mercantile paid a debt for which FHOI was responsible.

Alternatively, even if FHOI owed a Kroh-related entity money on the date of the loan for tenant finishes and improvements, the evidence shows that the debt would have been for more than $300,000 and therefore no payment in full occurred. Accordingly, the Court concludes that even if a debt did exist between KBDC or any other Kroh-related entity and FHOI for tenant finishes and improvements, the loan proceeds did not fully discharge that debt. For these reasons, the Court concludes and holds that Mercantile should not be subrogated to the lien of KBDC under the Wrap Mortgage.

## ORDER

For the reasons set forth above, it is hereby ORDERED, ADJUDGED and DECREED:

1. That Fox Hill Office Investors, Ltd. has no obligation to Mercantile Trust Company, N.A. under the subject note and mortgage.

2. That the recording of the mortgage given Mercantile is avoided as a fraudulent transfer pursuant to 11 U.S.C. § 548.

3. That the unrecorded mortgage given Mercantile is avoided pursuant to 11 U.S.C. § 544 and the lien is preserved for the benefit of the estate under 11 U.S.C. § 551.

4. That judgment be entered in favor of third-party defendant Kroh Brothers Development Company and against Mercantile Trust Company, N.A., on all counts of the third-party complaint against Kroh Brothers Development Company.

5. That costs be awarded to FHOI and KBDC and against Mercantile.