In re OTIS & EDWARDS, P.C., f/k/a Otis, Peters, Becker & Pietsch, P.C., f/k/a Peter R. Barbara & Associates, P.C., f/k/a Barbara, Ruby, Domol, Bowerman, Miller and Aaron, P.C., Debtor.

Robert B. WEBSTER, Trustee, and United States of America, Plaintiffs,

v.

Peter R. BARBARA, Defendant.

Bankruptcy No. 82–03508–G.
Adv. No. 83–1310.

United States Bankruptcy Court,
E.D. Michigan, S.D.

Jan. 2, 1990.

---

Wallace M. Handler, Snyder & Handler, P.C., Birmingham, Mich., for defendant.

Robert B. Webster, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., Trustee.

Peter A. Jackson, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for plaintiff-trustee.

David S. Grossman, Dept. of Justice, Tax Div., Washington, D.C., for U.S.

## MEMORANDUM, FINDINGS OF FACT AND CONCLUSIONS OF LAW

RAY REYNOLDS GRAVES,
Bankruptcy Judge.

The trustee objects to allowance of the secured claim Peter R. Barbara filed against chapter 7 debtor Otis & Edwards, P.C. based upon a February 5, 1981 promissory note and security agreement executed by Peter R. Barbara & Associates, P.C.[1] This adversary proceeding is before the court following a trial on the trustee's complaint to avoid the secured obligation to Peter Barbara under 11 U.S.C. § 544(b) or to subordinate his claim under 11 U.S.C. § 510(c). The trustee also seeks to recover $93,972.67 transferred to or on behalf of Peter R. Barbara under the terms of the February 5, 1981 promissory note and monies transferred by Peter R. Barbara & Associates, P.C. to Peter R. Barbara as shareholder loans. Adv.Pro. No. 83–1310, Complaint.

The trustee claims that the obligation incurred by Peter R. Barbara & Associates, P.C. and its contemporaneous grant of a security interest in the firm's assets to secure that obligation to repurchase Peter R. Barbara's shares of stock in the law firm are voidable under state law as constructive and intentionally fraudulent conveyances. Alternatively, the trustee argues that a *pro rata* payment of Peter Barbara's claim would be contrary to equitable principles established under federal law and that the court should subordinate his claim to those of all other claimants. Peter Barbara admits owing $1,641,868 under a shareholder loan arrangement with the law firm on February 5, 1981.

After consideration of the testimony and exhibits introduced at trial, the legal arguments advanced on brief, and an independent review of the applicable law, this court makes the following findings of fact and conclusions of law.

## I. FINDING OF FACTS

Between 1977 and February 5, 1981, Peter Barbara owned the 750 issued and outstanding shares of Peter R. Barbara & Associates, P.C., a law firm engaged almost exclusively in a plaintiff's personal injury practice. The firm had serious financial problems during the late 1970s and 1980.

Trial exhibits as well as testimony of clerical staff and of senior attorneys establish that the law firm's problems resulted in failure to pay trade creditors, clients, and taxing authorities on a timely basis. Severe cash-flow problems forced removal of a long-established computerized docketing system in 1979, and the firm became dilatory in removing closed-case files from its manual filing system.[2]

Exhibits establish the financial condition of the law firm on February 5, 1981, the date of the challenged transaction. A February 5 balance sheet prepared by the

1. Exhibit A, Exhibits # 3–# 5.

2. A former employee of Peter R. Barbara & Associates, P.C. testified about the firm's organizational problems. She further testified that she assisted in removing approximately 150 "closed" cases from the "open" files in May 1981, three months after Peter Barbara claims

firm's accountant shows that the firm had only $29,414 in cash assets in late January 1981.[3] Among its liabilities the firm listed single business tax arrearages for 1979 through 1981 amounting to $81,995, federal tax arrearages of $684,017, and trade credit payables of $569,111.[4] Further, the firm had negotiated agreements[5] to pay $577,058 owed to the former clients whose claims provide the basis for this proceeding. Simultaneously, Peter Barbara had increased the amount he owed on a "loan" account with the firm to $1,641,868.[6]

Testimony of the trustee's accounting expert further establishes the firm's financial condition. He calculated that the firm had a five-year weighted average net realization rate of twenty percent, evidencing availability of approximately one-half the amount of revenue generally recognized as available to partners in well-run and successful personal injury law firms.[7] In re-

sponse, Peter Barbara pointed to the firm's growth pattern and necessary expenses, explaining that he had paid $20,000 per week for television advertising during the late 1970s.[8] He did not attribute the problems to his maintaining a substantial personal "loan" receivable account[9] on the law firm's books, to the significant amounts he took as salary during those years,[10] or to taking cases of little merit.[11]

Personal legal problems occupied the time of Peter Barbara for several years prior to February 1981. Indeed, his withdrawal from the firm on February 5, 1981 preceded his suspension from the practice of law by just a few days.[12] Then, in July 1981, he pled guilty to a three-count Criminal Information charging him with mail fraud and interstate transportation of forged securities.[13] Following the plea, the court sentenced him to a 2½ year term of incarceration.

to have culled the files in order to remove closed files and to withdraw from low fee-potential cases. Docket #85, pp. 35–38.

3. Exhibit #7. The cash account declined from $474,535 on November 30, 1980. Exhibit A, p. 22. Exhibit F, prepared from Debtor's 1981 tax returns (fiscal year ending Jan. 31, 1981), indicates $16,000 in the cash account on January 31. See also, Exhibit #6.

4. Plaintiffs' accounting expert testified that the debtor's books and records indicated the existence of payables in addition to those reflected by the February 5 balance sheet. Exhibit F; Docket #86, p. 94.

5. Defendant, as president of the law firm, and his attorney Sheldon Otis had negotiated one to four year payment schedules with certain former clients who had not received their judgment and settlement proceeds. Docket #87, p. 24; Docket #88, p. 200, lines 2–16.

6. Exhibit #7; Exhibit F.

7. At trial, Peter Barbara's expert witness surmised the low revenue was attributable to a build-up of work in process since the records indicated that "something has happened here with the money." Docket #87, p. 180.

8. This occurred during the years when Defendant withheld plaintiffs' judgment and settlement proceeds.

9. Peter Barbara owed the firm $1,427,831 on November 30, 1980. Exhibit A, p. 22. On February 5, 1981, he acknowledged a debt amounting to $1,641,868. Exhibit #7.

10. Peter Barbara's salary varied from $56,000 in 1971 to $385,000 in 1973 to $255,000 in 1980 to $275,000 for fiscal year 1981. Exhibit B. Between November 30, 1980 and February 5, 1981, defendant received $30,000 as salary. Exhibit A, p. 22 and Exhibit B.

11. A former clerk testified that a file was opened for every potential client. Docket #85, pp. 28–29.

12. The Michigan Attorney Grievance Commission had been investigating Peter R. Barbara and his law firm since 1979. Eventually, he admitted fifteen charges made by the Commission that he had violated DR 1–102(A)(1), DR 9–102(B)(4), and Michigan GCR 953(4) by not promptly delivering to firm clients their share of settlement or judgment proceeds. In a stipulated order providing for Peter Barbara's three-year suspension from practice, the Grievance Administrator conditioned any reinstatement upon repayment of all clients who had not received judgment or settlement proceeds. See Plaintiffs' and Defendant's Joint Proposed Findings of Fact and Conclusions of Law filed on August 11, 1988 and September 10, 1988 in Adv.Pro. No. 83–1810.

13. The Federal Bureau of Investigation had examined the activities of Defendant and his law firm since 1979. At Peter Barbara's request, Sheldon Otis had dismantled his criminal defense practice in California to move into the Peter R. Barbara & Associates, P.C. offices to represent Peter Barbara. Docket #87, pp. 9–11. Peter Barbara eventually decided to plead guilty

By 1980,[14] Peter Barbara knew that his suspension from practice was imminent and that he must sell his interest in the firm or close his practice and obtain substitute counsel for his clients.[15] He also knew that he had personally guaranteed many of the law firm's obligations.[16] In addition, he knew he had a $1,641,868 loan payable[17] to the law firm and probable responsibility for accumulated tax arrearages approaching $750,000.[18]

Peter Barbara explored several ways to terminate his relationship with his law firm.[19] He failed in an attempt to sell his interest in the firm to an out-of-state attorney;[20] the firm's "senior" attorneys, admitted to practice less than five years, were unable or unwilling to assume ownership and management of the law firm.[21] Furthermore, Detroit area attorneys accepted referrals of contingent-fee cases on a file-by-file basis and only after careful evaluation of each file.[22] Finally, referral of a contingent-fee case would result in income to Peter Barbara only when and if the substituted attorney's efforts resulted in a settlement or favorable judgment.[23]

Against this factual background, Peter Barbara proposed[24] that Sheldon Otis acquire sole ownership of the firm by purchasing one share of stock in Peter R. Barbara & Associates, P.C. for $5,000.[25] Peter Barbara devised a "fair arrangement"[26] and structured the transfer of ownership and control to Sheldon Otis,[27] assuming that Sheldon Otis's combined criminal defense experience and exposure to the firm's clients and their cases during his participation in Peter Barbara's criminal defense qualified him to manage the firm.[28] According to former employees,

to transferring $3,000,000 from client trust accounts to other bank accounts and to taking the monies, without client authority, for his own use and benefit. Exhibit K., p. 2.

14. Docket # 87, p. 7.

15. The attorney who represented Peter Barbara in transferring firm ownership testified that one option considered was referral of the files to other attorneys. The attorney apparently believed Peter Barbara could, legally and ethically, receive a fifty percent referral fee from other attorneys despite his suspension from practice. Docket # 85, p. 159. But see Annotation, *Attorney's Right to Compensation As Affected by Disbarment or Suspension Before Complete Performance*, 24 A.L.R.3d 1193 (1969).

16. See Docket # 88, p. 200. Peter Barbara was personally obligated on many of the firm's notes payable and on the negotiated pay-out agreements with former clients, plaintiffs in this proceeding. These are listed as "accounts payable" on the firm's financial statements. The statements also establish that Peter Barbara personally guaranteed a corporate note for $75,000 at 20% interest on November 28, 1980. Exhibit A.

17. Peter Barbara planned to pay off his debt over a period of nine years with the principal to be set off against an amount owed by the law firm under a certain Stock Purchase Agreement. Exhibit A, p. 29.

18. Exhibit F; Exhibit # 6.

19. Docket # 87, p. 10, 1. 24.

20. Docket # 87, p. 8.

21. Peter Barbara's attorney testified that the "senior" attorneys at Peter R. Barbara & Associates, P.C. "were at the time [not] of a mind to step up and assume the obligation ... under the Purchase Agreement ... as shareholders in the corporation whereunder there was an indebtedness of some $3,300,000. Docket # 85, p. 175.

22. Docket # 86, pp. 131–137.

23. Docket # 87, p. 106, lines 4–21; Docket # 85, p. 131, lines 21–25.

24. Docket # 87, p. 9, 1. 6.

25. Docket # 87, p. 102, lines 18–25; p. 102, lines 1–3.

26. The record does not indicate that Peter Barbara obtained an independent evaluation of the case files in determining their fee potential. Neither does the record indicate that Sheldon Otis actually participated in the inventory and evaluation of the files. Docket # 87, p. 58, 1. 58.

27. Peter Barbara retained an attorney who had represented the law firm before the Internal Revenue Service on an unpaid payroll tax issue to draft the Stock Purchase Agreement by which he transferred ownership of the firm to Sheldon Otis and sold his remaining shares of stock to the firm. Docket # 85, p. 150; Docket # 87, p. 13.

28. Docket # 87, p. 12, 1. 12. Testimony at trial indicated that Sheldon Otis had tried personal injury cases during an earlier stage of his career. No testimony established either recent

however, Sheldon Otis demonstrated his inability to perform soon after the transfer of ownership.[29]

On February 5, 1981, Peter R. Barbara & Associates, P.C., acting through its president Peter R. Barbara, repurchased Peter Barbara's remaining 749 shares of stock for $3,365,000. Peter Barbara, as firm president, also granted himself a security interest in firm assets[30] to assure the firm's performance under a ten-year payment schedule. As consideration, Peter R. Barbara agreed to return his share certificates and reaffirmed his long-standing loan obligation to the firm.[31]

Peter Barbara and his attorney tailored the stock purchase agreement to accomplish Peter Barbara's personal agenda.[32] First, the parties bound their successors and assigns to the agreement. Second, Peter Barbara received an option[33] to regain a controlling interest in the law firm, contingent only upon his obtaining a license to practice law in Michigan between February 16, 1984 and February 1991. Under the agreement, Peter Barbara had twenty years to buy into the firm. Third, the parties conditioned payment of each installment to Peter Barbara upon the existence of adequate surplus as defined by Michigan statute. However, the law firm also agreed to increase the surplus by revaluing the firm assets or by changing the stated capital of the corporation at any time an insufficient surplus should prevent a full payment to Peter Barbara.[34]

In addition, the parties agreed that a formula set forth in "Exhibit C"[35] to the purchase agreement established the method for determining "fair market value" of the shares of Peter R. Barbara & Associates, P.C. for purposes of the 749 share repurchase, the one-share purchase by Sheldon Otis, and any exercise of the contingent option in favor of Peter R. Barbara.

Peter Barbara admits structuring the stock transfer transaction in a way that would allow him to "maintain a firm hand in a similar[ly structure[d]" law firm upon his return to practice and to secure for himself one-third of the gross fees contained in the files at his departure.[36] He also planned that the successor firm would pay his former clients in accordance with the agreements he had executed in mid–1980, would pay doctors for past-due charges for services on settled cases, and would satisfy past-due tax obligations.[37] Finally, he planned to repay his personal

personal injury experience or a background in law firm management. Docket #87, p. 94.

**29.** Docket #88, pp. 59–60; Docket #88, p. 99, lines 6–17.

**30.** *His security interest covered contract rights, work in process and all replacements, substitutions, and proceeds.* Exhibit A.

**31.** Exhibit A.

**32.** Docket #85, p. 158. Peter Barbara and his attorney believed that the corporate interest, before the transfer, was the same as his and that the law firm did not need independent counsel. Docket #87, p. 14, 1. 18; Docket #85, p. 176, lines 14–15.

**33.** Peter Barbara's expert on law firm accounting, mergers, and acquisitions admitted that he had never seen such an option "in all my years of practice." Docket #88, p. 29. He further testified that he would advise a client not to enter into a transaction by which he could be required to give up fifty-one percent of a small firm. Docket #88, pp. 29–30.

**34.** Exhibit A.

**35.** Although Peter Barbara testified that he and his employees counted and evaluated the files, he presented neither an inventory list nor other records to support his testimony. Neither did he submit an appraisal by an independent personal injury attorney or an accountant. Testimony by a former clerk at the law firm and by the bankruptcy trustee's employees successfully rebutted any presumption of accuracy that might exist as to the number of cases and the care used in the inventory and evaluation. See Dockets #86, #87.

**36.** Docket #87, p. 33, lines 14–15. Peter Barbara believed he was entitled to one-third of the potential fees available to the firm by virtue of the files in the office on February 5, 1981. Docket #87, pp. 21, 104.

**37.** Under the agreement, Peter Barbara expected that the reorganized firm would pay the taxes that had accrued during his term of ownership, the legal fees that had accumulated during the FBI and Attorney Grievance Board investigations of his legal activities, the monies owed former clients due to his personal misconduct, and the outstanding loans which he had personally guaranteed. Exhibit A; Docket #87, p. 33.

debt to the corporation through a setoff in 1991.[38]

## II. APPLICABLE LAW

 The trustee "steps into the shoes" of a creditor in order to nullify transfers voidable under state law and to obtain control of property of the estate for *pro rata* distribution to creditors. 11 U.S.C. § 544(b); *N.L.R.B. v. Martin Arsham Sewing Co.,* 873 F.2d 884, 887 (6th Cir.1989); *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 202 (7th Cir.1988); *American National Bank of Austin v. Mortgageamerica Corp. (In re Mortgageamerica Corp.),* 714 F.2d 1266 (5th Cir.1983). Property that has been fraudulently conveyed should be subject to equitable distribution under the Bankruptcy Code. *Martin Arsham Sewing Co.,* 873 F.2d at 887.

### CONSTRUCTIVE FRAUD

In deciding the fraudulent conveyance question, this court must consider the meaning of the Michigan statute forbidding fraudulent conveyances. M.C.L. § 566.11 *et seq.* Enacted in 1919, this statute is a uniform state law that codifies common and statutory law stretching back to the Statute of Elizabeth, 13 Eliz. c.5 (1571); see 1 G. Glenn, *Fraudulent Conveyances and Preferences,* sec. 58–62 (rev.ed.1940). The court must interpret the fraudulent conveyance act to make uniform the law of the states which enact it. M.C.L. § 566.22. Consequently this court will, in the appropriate circumstances, use the Uniform Fraudulent Conveyance Act ("UFCA") and the corresponding Michigan Statutes interchageably.

Under the UFCA, the term "conveyance" includes security interests. M.C.L. § 566.11. As to constructive fraud, Michigan's fraudulent conveyance act provides, in pertinent part:

> Every *conveyance made* and every *obligation incurred* by a person *who is* or *will be* thereby rendered *insolvent* is

fraudulent as to creditors *without regard to his actual intent* if the conveyance is made or the obligation is incurred *without a fair consideration.*

M.C.L. § 566.14 [emphasis added].

### 1. *Fair Consideration*

 The trustee indisputably bears the burden of proving that the debtor failed to receive fair consideration. *Mason v. Mason,* 296 Mich. 622, 626–27, 296 N.W. 703 (1941). *See also In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 388 (Bankr.E.D. Pa.1988) (Trustee bears the same burden under 11 U.S.C. § 548).

Under § 3 of the UFCA (M.C.L. § 566.13) the debtor must receive "fair consideration." The UFCA does not define fair consideration, but indicates that when the debtor transfers property or incurs an obligation, fair consideration is received:

> (a) When in exchange for such property, or obligation, as a *fair equivalent* therefor, *and in good faith, property* is conveyed or *an antecedent debt* is satisfied, or

> (b) When such property, or obligation is received *in good faith* to secure *a present advance* or *antecedent debt* in amount not disproportionately small as compared with the value of the property or obligation obtained.

M.C.L. § 566.13 [emphasis added].

Section 3 of the UFCA is the source of a fair amount of confusion. Fair consideration is received by the debtor when in exchange for property or an obligation the debtor receives its fair equivalent, but what is fair equivalence?[39] Further, what role, if any, does "good faith" play in determining whether the debtor has received fair consideration?

 This court reads § 566.13 to require a finding that the values exchanged were equivalent *and* that the transferee acted in good faith. If a finding of fair equivalence

---

**38.** Exhibit A, p. 29.

**39.** The court in *In re Anderson Industries, Inc.,* 55 B.R. 922, 927 (Bkrtcy.W.D.Mich.1985) *citing Dunn v. Minnema,* 323 Mich. 687, 693, 36 N.W.2d 182 (1949), which quotes *McCaslin v.*

*Schouten,* 294 Mich. 180, 186–87, 292 N.W. 696 (1940), states that "A determination of what constitutes fair consideration ... depends upon whether the conveyance renders the debtor execution proof." What does rendering the debtor "execution proof" mean?

is made, the court must determine whether the transferee acted in good faith. Where the debtor does not receive fair equivalence or where the transferee fails to act in good faith, this court will make a finding that the debtor did not receive fair consideration.

### a. fair equivalence

The trustee recovering a fraudulent conveyance under § 548 of the Bankruptcy Code is required to prove that the debtor received "less than reasonably equivalent value." 11 U.S.C. § 548(a)(2)(A). Is proving "less than reasonably equivalent value" under § 548 (or for that matter under § 4 of the Uniform Fraudulent Transfer Act ("UFTA")) [40] the same as proving lack of "fair consideration" under § 3 of the UFCA? Section 548 of the Bankruptcy Code is modeled on the UFCA,[41] and therefore this court believes that in substance the two terms have the same meaning. The key to understanding the concept of fair consideration is found not in the form of the terms but rather the transactional context in which the issue arises. To this court "fair consideration" equals "reasonably equivalent value." What constitutes fair consideration (or reasonably equivalent value), will change from setting to setting.

For example, at a foreclosure sale the debtor's property is exchanged for reasonably equivalent value under § 548 when the sale brings a price greater than 70% of the property's fair market value.[42] In *Cole* the court states that the issue under § 548 is whether the debtor's estate is "unreasonably depleted" by the transfer. If the *Cole* Court had been deciding the fraudulent conveyance question under the UFCA, it would have reached the same result. What is reasonable depletion in one setting, may be a fraudulent gift in another.

In contrast, cases where the debtor repurchases its own stock, determining the

exact value received by the debtor in exchange for what it has conveyed, is a more difficult question. In *In re Corporate Jet Aviation, Inc.*, 57 B.R. 195 (Bankr.N.D.Ga. 1986), the court rejected the 70% rule because of the difficulties in determining the value received by the debtor. There the debtor paid defendant $450,000 in exchange for shares in the debtor company and for the release by defendant to particular rights it held against the debtor. These repurchased shares placed the debtor in a position to sell certain assets that it otherwise would not have been able to sell. The court held that while the stock repurchased was worth something less than $450,000, the reasonably equivalent value requirement of § 548(a)(2)(A) was met because of the additional benefits, i.e., the ability to sell certian assets, that flowed to the debtor as a result of this transaction.

In stock repurchase transactions decided under the UFTA, the court focuses on not only that which was received by the debtor, but also the nature of dealing. In *In re Pinto Trucking Service, Inc.* 93 B.R. 379 (Bankr.E.D.Pa.1988) the court found that the trustee failed to meet his burden of proving that the debtor failed to receive fair consideration. As in *Corporate Jet*, the court in *Pinto* found that the debtor received not only its' stock, but something more—the release of claims held against the debtor. More important to the *Pinto* Court was the fact that the transaction in question was conducted at arms-length. In relying on *In re Appomattox Agri–Service, In.*, 6 BCD 1239, 1241 (Bankr.W.D.Va. 1980) *Pinto* adopts the position that there is no fraudulent conveyance even when the value flowing to the debtor is zero, provided the transaction is consumated at arms-length.

This court believes, however, that finding fair consideration merely because the transaction was conducted at arms-length

---

**40.** Under the UFTA the standard for evaluating the values exchanged between the debtor and the transferee, is whether the debtor "made the transfer or incured the obligation ... without receiving a reasonably equivalent value ..."

**41.** *McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), *cited* in *In re Joshua Slocum, Ltd.,* 103 B.R. 610 (Bankr.E.D.Pa.1989).

**42.** *See In re Cole,* 81 B.R. 326 (Bkrtcy.E.D.Pa. 1988).

proves too much. Certainly if Congress had intended fair consideration to be synonymous with the concept of an arms-length deal, it could have easily written the Bankruptcy Code to say as much. This court believes Congress intended more. Specifically, the court must also look at the value of what the debtor received, in order to determine whether, in the particular context, "the debtor's estate was unreasonably depleted." Consequently, even in the rare circumstances where the debtor bargains at arms-length and receives little or nothing of value in return, there cannot be a finding of fair consideration. Judge Howard accurately addresses this point when he states that "Taking the UFCA as a whole, its clear purpose is to allow creditors to set aside any conveyance made by a debtor in which the debtor received far less than he gave, and which rendered the debtor insolvent and unable to satisfy other creditors." [43]

■ For reasons already indicated, this court similarly holds that receipt by the debtor of its' own stock is also an element in a fair consideration calculation. Depending on the circumstances, the stock that the debtor repurchases may bring with it a number of additional benefits. For example it is not inconceivable that a company or some of its assets would be more attractive to a potential buyer if shares of stock were not held by a particular individual or distributed in a particular manner. In such a situation the company might be in a better position to make a sale to such a buyer by repurchasing its own shares. It is these additional benefits, and not solely the value of the stock, which the court must look at in evaluating whether fair consideration is received.[44]

The trustee in the instant case claims that while the repurchased shares may have had value to a third party they did not have any value for the debtor, and therefore it could not have received fair consideration. Certainly as a matter of corporate law the trustee is correct in asserting that treasury shares are not assets of the corporation.[45] Also as a matter of corporate finance theory a companies' stock has no extrinsic value to the corporation itself.[46]

These principles are of limited use in the fraudulent conveyance context. As noted earlier, at least under § 548 of the Bankruptcy Code and under the UFTA, courts hold that the debtor's receipt of its own stock is a part of the "reasonably equivalent value" calculus.[47] As a matter of fraudulent conveyance law the courts in these cases apparently found that from the creditor's point of view some additional value flowed to the debtor, that otherwise would not have, as a result of repurchasing its' own stock.[48] Given that for purposes of fraudulent conveyance analysis reasonably equivalent value and fair consideration are the same, this Court holds that a stock repurchase by the debtor may represent a conveyance of value to that debtor.

■ Thus in deciding the fair consideration question a court must look at more than the form of the transaction. In sum, before this court can determine whether fair consideration was received by the debtor it must consider the following:

---

**43.** See In re Anderson Industries Inc., supra at 926.

**44.** Cf. In re Lawrence Paperboard, 76 B.R. 866 (Bankr.D.Mass.1987) (a corporate debtor who becomes a surety/guarantor of another's debt, while not receiving the proceeds of the loan, received fair consideration).

**45.** See Christie v. Fifth Madison Corp., 13 A.D.2d 43, 211 N.Y.S.2d 787, 795 (1961) (While held by the corporation, shares of stock have no value since they carry no voting rights and no rights as to dividends or to distributions).

**46.** Hansen v. Finn (In re Curry and Sorensen, Inc.), 57 B.R. 824, 829 (B.A.P. 9th Cir.1986).

**47.** In re Corporate Jet Aviation, Inc., supra; In re Pinto Trucking Service, Inc., supra.

**48.** See In re Corporate Jet Aviation, Inc. supra at 198 "While the Court is aware of the policy of administering the estate for the benefit of the creditors, the Court does not find that this policy necessitates a finding that the redemption of stock provides no value to the debtor. The value inures to the remaining equity holders by increasing their share of the estate, in the same manner that the payment of a debt increases the remaining creditors' share of the estate. It follows that to the extent that Vantress' [defendant] stock had value when Vantress was paid, Vantress transferred value to CJA [corporate debtor]."

(1) whether the transaction was conducted at arms-length;

(2) what property or rights were transferred to the debtor;

(3) whether the debtor received additional valuable benefits as a result of the transaction; and

(4) whether the debtor has been rendered "execution proof."

In some circumstances it will be clear that the debtor received fair consideration simply by looking at the value of the property received. When this is not the case a thorough analysis will require a review of all four factors.

#### b. good faith

M.C.L. section 566.13 contains a good faith requirement which most courts, in determining fair consideration, have either ignored or somehow diluted by their discussions on fair equivalence. This court believes the correct interpretation is provided by those courts that analyze good faith separate from fair equivalence.[49] A transaction that fails either requirement—reasonable equivalence or good faith—will be avoided on the ground that the debtor did not receive fair consideration.

The courts that have considered the good faith requirement of M.C.L. § 566.13 (UFCA § 3) have, according to one commentator, differed on which of the transferee's attributes should be the focus of attention.[50] Some courts believe that it is the transferee's knowledge that is important in determining whether the transferee acted in good faith ("knowledge test"). Under this approach the transferee's mere knowledge of the debtor's poor financial position or the debtor's fraudulent intent will cut against a finding of good faith. Other courts focus on the transferee's motives for involving itself in the transaction

under attack ("motive test"). Here, the transferee who does no more than protect an already existing claim is considered to have acted in good faith, even if the transferee has knowledge of the debtor's condition or fraudulent intent. If, however, the transferee aids the debtor in fulfilling the debtor's fraudulent scheme, a finding of bad faith is made.[51]

■■■ This court is convinced that more than mere knowledge of the debtor's financial situation or fraudulent intent is required to find a lack of good faith. As commentators have suggested, voiding transfers based on the transferee's mere knowledge under state fraudulent conveyance laws would make the preference laws of Bankruptcy Code § 547 superfluous. Consequently good faith for purposes of this case, will turn on whether the transferee, Peter R. Barbara, aided the debtor in a fraudulent scheme.

### 2. Insolvency

After the court determines whether fair consideration was received by the debtor, one of the parties is responsible for establishing whether the debtor was insolvent prior to or as a result of the conveyance under attack. M.C.L. § 566.14. A debtor is insolvent when:

> the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

M.C.L. § 566.12(1).

■■■ Before addressing the issue of how one proves solvency, a court is required to first establish who must prove solvency. As a general proposition in Michigan, "where a sale of property is at-

---

49. See Note, *Good Faith and Fraudulent Conveyances,* 97 Harv.L.Rev. 495, 499 & 505 *citing Smith v. Whitman,* 39 N.J. 397, 405, 189 A.2d 15, 10 (1963); *Hersh v. Levinson Bros.,* 117 N.J.Eq. 131, 174 A. 736 (1934); *Johnson v. Lentini,* 66 N.J.Super. 398, 169 A.2d 208 (Ch.Div.1961).

50. Note, *Good Faith and Fraudulent Conveyances, supra.*

51. The transferee aids in the debtor's fraudulent scheme when the transferee seeks:

(1) to secure some advantage for the debtor beyond the mere satisfaction of the debt;

(2) to obtain some advantage for himself beyond that naturally resulting from the payment of the debt; or

(3) to cause some harm to other creditors beyond the sort that would typicaly result from the postponement of their claims.

Note, *Fraudulent Conveyances supra,* at 508.

tacked as fraudulent as to creditors, the burden of proof is on the attacking party to establish such fraud." [52] What the Michigan Supreme Court meant when it said "such fraud" developed later in the same Opinion when the Court states that "We are of the opinion in this case the burden was upon the plaintiff to show *inadequate consideration* for the deed, and that because of failure to carry this burden, the trial court was correct in its determination [to dismiss the bill of complaint]." *Id.* 296 Mich. at 628, 296 N.W. 703. (emphasis added). Thus, in order to avoid dismissal, the attacking party has the burden only of establishing "inadequate consideration." The *Mason* Court did not hold that the plaintiff must in addition prove the debtor's insolvency and neither will this court. This interpretation is in accord with the majority view that once the plaintiff establishes inadequate consideration, the burden of proving the debtor's solvency then shifts to the party seeking to uphold the transfer. [53] Where lack of fair consideration has already been established a contrary interpretation would place too onerous a burden on the plaintiff. This is especially true where, as in the present case, the defendant claims that the bulk of the value in the assets transferred to the debtor, is derived from some amorphous source. Where the party seeking to uphold the transaction claims that a particular asset is of a certain value, this court holds that it is he and not the challenging party (after lack of fair consideration is established) who must carry the burden of proving such value.

**52.** *Mason v. Mason,* 296 Mich. 622, 626, 296 N.W. 703 (1941).

**53.** *See United States v. Gleneagles Investment,* 565 F.Supp. 556 (M.D.Pa.1983), *aff'd sub nom.; United States v. Tabor Realty Corp.,* 803 F.2d 1288 (3rd Cir.1986); *cert denied sub nom.; McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *In re Pinto,* 98 B.R. 200 (Bankr.E.D.Pa.1989).

**54.** Peter Barbara's argument that the propriety of the transfer must be determined by interpretation of the Michigan corporation statute's surplus provision is without merit. Rather, the court must apply the test of insolvency as set forth in the Uniform Fraudulent Conveyance Act. *Hyde Properties v. McCoy,* 507 F.2d 301,

For the court to hold that a fraudulent conveyance was made by the debtor the court must find insolvency based upon the value of the assets and the liabilities as they existed prior to or as a result of the challenged transfer. [54] *Otte v. Landy,* 143 F.Supp. 893, 898 (E.D.Mich.1956), *aff'd,* 256 F.2d 112 (6th Cir.1958); *Wright v. Brown,* 317 Mich. 561, 571, 27 N.W.2d 97 (1947). In other words, either just before or just after the transfer, the debtor must have been unable to make ultimate payment of then-existing obligations from then-existing assets. *McDivitt v. Mapes,* 299 Mich. 329, 333–334, 300 N.W. 107 (1941); *Watzel v. Beardslee,* 289 Mich. 522, 286 N.W. 813 (dissenting opinion) (1939); *Mossler Acceptance Co. v. Martin,* 322 F.2d 183, 186 (5th Cir.1963), *cert. denied,* 376 U.S. 921, 84 S.Ct. 679, 11 L.Ed.2d 616 (1964).

Only a finding that the transferor's entire nonexempt property and assets had an insufficient "present fair salable value" to pay its debts establishes insolvency within the meaning of the UFCA. *Furniture Manufacturers Sales, Inc. v. Deamer,* 680 P.2d 398, 400 (Utah 1984).

A "balance sheet" test is used to determine insolvency under § 547(b) of the Bankruptcy Code for the reason that "a man ought not to be forced into bankruptcy if, at a fair valuation of his possessions, he has more than he owes." [55] Insolvency under the UFCA is easier to prove than insolvency in the bankruptcy sense, and hence if insolvency for purposes of § 547(b) is established a finding of insolvency under the UFCA is warranted. [56]

307 (6th Cir.1974). In *Hyde,* the trial court found the corporation's balance sheet misleading and concluded that the corporation was worth much less than the balance sheet indicated. *Id.* at 307.

**55.** *In re Fleet,* 89 B.R. 420, 424–25 (Bankr.E.D.Pa.1988), *citing* COLLIER ON BANKRUPTCY, 547.26, at 547–107 to 547–108 n. 3 (5th ed.1987), and *McGill v. Commercial Credit Co.,* 243 F. 637, 646–49 (D.Md.1917).

**56.** *See Fleet supra,* at 425 where the Court indicates that "UFCA insolvency embraces not only insolvency in the bankruptcy sense, but also a condition wherein a debtor has insufficient present saleable assets to pay existing debts as they mature." (citations omitted).

■ Consequently, the court may consider unaudited balance sheets, expert testimony, and appraisals in calculating the "fair present salable value" of the transferor's assets. *Waldschmidt v. Ranier (In re Fulghum Construction Co.),* 7 B.R. 629, 633 (Bankr.M.D.Tenn.1980), *aff'd,* 14 B.R. 293 (M.D.Tenn.1981); *Consove v. Cohen (In re Roco Corp.),* 21 B.R. 429, 435 (B.A. P.1st Cir.1982); *Mack v. Bank of Lansing,* 396 F.Supp. 935, 941 (W.D.Mich.1975). It is well settled that book value[57] and present fair salable value measure different things and that book value does not establish fair salable value. *Seligson v. New York Produce Exchange,* 394 F.Supp. 125, 128–32 (S.D.N.Y.1975). Therefore, the court must consider justifiable assertions that a transferor's "fixed" assets have greater than book value. *Randall v. Bailey,* 288 N.Y. 280, 43 N.E.2d 43, 49 (1942). As explained in *Otte v. Landy,* 143 F.Supp. 893, the court should consider evidence of the "actual" value of the assets, especially when the transferor has had an appraisal made of its "fixed assets by a reputable, efficient firm" and thus can substantiate its claim that the assets have greater than "book" value. *Id.* at 896–898.

■ The court also may look beyond bare balance sheet numbers when a question arises concerning the accuracy of the figures or the valuations. *Hyde v. McCoy,* 507 F.2d 301, 307 (6th Cir.1974); *Mack v. Bank of Lansing,* 396 F.Supp. at 941. Indeed, when the court concludes that the corporate balance sheet inaccurately reflects the transferor's financial condition, the court may evaluate the assets in light of their nature and the circumstances of the case. *In re Fulghum Const. Co.,* 7

B.R. at 638; *Constructora Maza, Inc. v. Ponce,* 616 F.2d 573, 577 (1st Cir.1980).[58]

In determining "insolvency" under the easier UFCA standard the court first must consider whether each asset has a "present[59] fair salable value." Then, the court must compare the total value of assets meeting that standard to the total debts that constitute "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent" upon which the transferor has "probable liability." *Baker v. Geist,* 457 Pa. 73, 321 A.2d 634 (1974); M.C.L. §§ 566.11, 566.12. Finally the court must determine whether the value of the debtor's assets was less than that which was required to pay debtor's debts as they became absolute and matured.

■ Assets that cannot be liquidated are not counted in determining the value of "salable" assets.[60] "It is the liquid, salable nature of the assets—those which could be liquidated to satisfy creditors if necessary—which alone are significant for purposes of [the UFCA]."[61]

■ In addition, the bankruptcy court may exercise its discretion in assigning a value to a claim that is inchoate and uncertain in character and amount. *Penn v. Grant,* 244 F.2d 309, 310 (9th Cir.), *cert. denied,* 355 U.S. 837, 78 S.Ct. 58, 2 L.Ed.2d 47 (1957); *Allegaert v. Chemical Bank,* 418 F.Supp. 690 (E.D.N.Y.1976).

## ACTUAL FRAUD

In order to prevail on its claim that Peter R. Barbara & Associates, P.C., acting through its president Peter Barbara, actually intended to hinder, delay, and defraud

---

57. As explained by the Michigan Supreme Court, "[B]ook value of a business is based upon the actual cost . . . of the stock of merchandise and accounts on hand less such depreciation as has actually accrued. Ordinarily, a stock of merchandise is worth what it will fetch in the open market." *Mills v. Rich,* 249 Mich. 489, 493, 229 N.W. 462 (1930).

58. In determining whether a transferor was solvent at the time of a challenged transfer, the court must assess the value of a debtor's assets not strictly in accounting terms but in terms of "salable value."

59. The court may not disregard the word "present" by allowing a period of time for marketing the assets. *Angier v. Worrell,* 346 Pa. 450, 31 A.2d 87, 89 (1943).

60. *Chase National Bank of City of New York v. United States Trust Co. of New York,* 236 A.D. 500, 503, 260 N.Y.S. 40, *aff'd,* 262 N.Y. 557, 188 N.E. 63 (1933); *Corbin v. Franklin National Bank (In re Franklin National Bank Securities Litigation),* 2 B.R. 687, 711 (Bankr.E.D.N.Y. 1979).

61. *Fleet supra,* at 425.

creditors, the trustee must satisfy the standards set forth in M.C.L. § 566.17, which states:

> Every *conveyance made* and *every obligation incurred with actual intent,* as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

[emphasis added].

 Fraudulent intent is a question of fact,[62] not law, and as such is a question for this court to determine based on the relevant evidence provided by the parties. Unlike the constructive fraud analysis, actual fraud focuses on the intent of the debtor-tranferor, not the transferee.[63]

Because intent is often difficult to verify courts have always grappled with the problem of determining whether a party actually had a particular state of mind at a particular point in time. It is a rare occassion indeed when an individual stands up and admits to making a transfer while possessing a fraudulent intent. Consequently, courts have been forced to look to indicia of the debtor's intent, called "badges of fraud," in order to find actual intent.[64] This list of badges requires the court to look at a number of factors including:

(a) Relationship between the debtor and the transferee.

(b) Lack of consideration for the conveyance.

(c) Insolvency or indebtedness of the debtor.

(d) The transfer of the debtor's entire estate.

(e) Reservation of benefits, control or dominion by the debtor.

(f) Secrecy or concealment of the transaction.

62. M.C.L.A. § 566.224.

63. When the transferee's position allows it to dominate or control the debtor's disposition, the transferee's intent may be imputed to the debtor-transferor. *Pinto supra,* at 499, *citing* 4 COLLIER ON BANKRUPTCY, 548.02, at 548–34 (15th ed.1988).

64. While the trustee generally has the burden of proving actual fraud, he may prove it by infer-

(g) Pendency or threat of litigation at the time of the transfer.

*In re Steele,* 79 B.R. 503, 504 (Bkrtcy.M.D. Fla.1987), *citing Cleveland Trust Co. v. Foster,* 93 So.2d 112 (Fla.1957). While these badges of fraud are not conclusive, courts that use them as guides agree that the strength of the plaintiff's case increases with the presence of more badges.[65]

On the issue of intent, Judge Proctor states that "If the legal *effect* of the conveyance is to delay or hinder creditors, it is fraud in the law regardless of the actual motives of the debtor or transferee." *Steele supra,* at 504, *citing Livesay Industries, Inc. v. Livesay Window Co.,* 305 F.2d 934 (5th Cir.1962) (emphasis added). This interpretation seems to ignore the plain meaning of the statute which requires finding that the debtor incured the obligation with actual intent to hinder, delay, or defraud.

### EQUITABLE SUBORDINATION

Alternatively, the trustee asks the court to subordinate Peter R. Barbara's claim, under the doctrine of equitable subordination, to those of all other general creditors. 11 U.S.C. § 510(c). Section 510 states in pertinent part:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing a subordinated claim be transferred to the estate.

ence from facts and circumstances surrounding the transaction. *Wright v. Brown,* 317 Mich. 561, 574, 27 N.W.2d 97 (1947); *Bentley v. Caille,* 289 Mich. 74, 77–78, 286 N.W. 163 (1939).

65. *Steele, supra* (Where five badges were present, court found that transfer was made with the purpose of delaying, hindering, or defrauding creditors); *Frank J. Kelly et. al.,* 725 F.Supp. 1446 (W.D.Mich. Dec. 2, 1988).

This court must decide whether Peter R. Barbara violated the "rules of fair play and good conscience" in his dealings with the firm's creditors. *Pepper v. Litton,* 308 U.S. 295, 310, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939). In deciding this question, the bankruptcy court has the authority and responsibility to "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the debtor's estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder" *Id.* at 308, 60 S.Ct. at 246.

 Traditional equitable subordination analysis involves an application, by the court, of a triparte test. The court must generally determine whether:

(1) The claimant engaged in some type of inequitable conduct;

(2) Said conduct resulted in injury to creditors of the debtor or conferred some unfair advantage on the claimant; and

(3) Equitable subordination of the particular claim is inconsistent with the policies stated in the Bankruptcy Code.[66]

Before a judicial inquiry into these three elements is made the court must determine whether the claimant/defendant is an insider. If the claimant is not an insider or fiduciary the plaintiff carries a heavier burden of proof with regard to the three part test.[67] However, if the claimant is an insider

"the objecting party has the initial burden of coming forward with some substantial facts to overcome the prima facie validity of the verified proof of claim. *In*

*re Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980); *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir.1977). Once the initial standard is met, the burden shifts to the claimant to demonstrate the good faith and fairness of the conduct. *Pepper v. Litton, supra* 308 U.S. at 306, 60 S.Ct. at 245; *In re Mobile Steel, supra* at 701. *In re Shelter supra* 98 B.R. at 230–31.

 There are three categories of inequitable conduct for the plaintiff to draw on in order to meet its' initial burden. The plaintiff may provide facts which prove:

(1) Fraud, illegality, or breach of fiduciary duty;

(2) Undercapitalization; or

(3) Use of debtor as an alter ego or instrumentality.

*Id.,* at 231, *citing In re Dan–Ver Enterprises, Inc.,* 86 B.R. 443 (Bankr.W.D.Pa. 1988).

We note that equitable subordination is a remedy that is rarely used by courts. "Any attempt to adjust equities between a junior and senior creditor ... must be 'scrupulously measured and fitted to the actual injury that has been done or the unjust enrichment that is involved.'"[68]

## III. DISCUSSION

 The chapter 7 trustee has standing to pursue the fraudulent conveyance action as the representative of claimants no. 95, 106, and 107, each of whom was an unsecured creditor[69] of Peter R. Barbara & Associates, P.C.[70] on February 5, 1981 and none of whom had been paid when the voluntary chapter 11 petition was filed on June 16, 1982. The United States filed a

---

**66.** *See e.g., Matter of Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977); *In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1282 (8th Cir.1988); *In re Missionary Baptist Foundation,* 712 F.2d 206, 212 (5th Cir.1983); *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.),* 799 F.2d 726, 731 (11th Cir.1986); *In re Shelter Enterprises Inc.,* 98 B.R. 224, 230 (W.D.Pa.1989).

**67.** "If the claimant is not an insider or fiduciary, however, the trustee must prove more egregious conduct such as fraud, spoilation or over-reaching and prove it with particularity." *In re Shelter Enterprises Inc.,* 98 B.R. 224 (Bankr.W.D.Pa.1989) *citing In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986).

**68.** *In re Fox Hill Office Investors, LTD.,* 101 B.R. 1007, 1022 (Bankr.W.D.Mo.1989), *citing In re Kansas City Journal–Post Co.,* 144 F.2d 791, 801[7] (8th Cir.1944).

**69.** The fact that Peter Barbara assigned his promissory note to himself as trustee of the Peter R. Barbara Revocable Living Trust in May 1981 and then, as trustee of that revocable trust, entered into security agreements with certain of the unsecured creditors is irrelevant to analysis of the legal questions presented in this proceeding.

**70.** As mentioned above, the debtor law firm is a successor to Peter R. Barbara & Associates P.C.

proof of claim asserting both a secured and a priority tax claim against the estate.

## CONSTRUCTIVE FRAUD

The trustee argues that the obligation Peter R. Barbara & Associates, P.C. incurred and the security interest it granted to Peter R. Barbara on February 5, 1981 were constructively fraudulent as to unsecured creditors and must be set aside. He argues that the law firm received little or no consideration for the obligation and security interest, i.e. that the conveyances were not for "fair consideration". Peter Barbara contends, however, that the law firm did receive fair consideration for the obligation and security interest.

### No Fair Consideration

#### 1. Fair equivalence

■ The court agrees with the trustee. Peter R. Barbara & Associates, P.C. did not, from the standpoint of unsecured creditors, receive "fair consideration." At the time of the transaction in question, Peter R. Barbara was an insider who had the opportunity to take advantage of the knowledge and influence he possessed when dealing with his law firm. The 749 shares of stock Peter Barbara returned to the firm represented his ownership interest in the professional corporation. These shares represented assets that had little, if any salable or liquifiable value. *See infra.* Moreover, there was no evidence presented suggesting that the law firm was able to do more after receiving the share than it could have before the transaction. Consequently the transfer of the shares did not in this case, bring with it any additional unquantifiable benefits

Peter Barbara's promise to repay the monies he had withdrawn from the firm in prior years represents no new value to the firm. He merely restated a promise purportedly made years earlier.

The court also concludes that Peter Barbara's agreement to allow payment

through installments over a ten-year span and not in a lump sum did not, from the standpoint of creditors, constitute fair consideration for the obligation and security interest in all assets and proceeds in favor of Peter Barbara.[71] It cannot be said that the law firm received something of value to the firm or its creditors when Peter Barbara agreed to receive periodic payments that were disproportionately large for the 749 shares of stock he returned to the law firm instead of receiving a disproportionately large lump sum payment.

By granting himself a security interest covering accounts receivable, retainer agreements, contract rights, work in process, machinery, equipment, and fixtures as well as all replacements and proceeds to himself,[72] Peter Barbara put all then-existing and future assets outside the reach of unsecured creditors who might file suit and seek to execute on judgments.[73] Furthermore, by granting himself a security interest, he assured that his claim would be considered for priority status in the event of the law firm's dissolution or bankruptcy. In return for the security interest and its anticipated advantages, Peter Barbara gave *nothing* of value to the firm or its creditors.

The benefits of the repurchase agreement were to flow, exclusively, to Peter Barbara. He planned to extinguish his interest in the professional corporation. Yet he planned to receive firm monies during his suspension from practice. He also expected to assume control of the law firm if he regained his license to practice law. In addition, he expected the firm, during his absence, to satisfy tax obligations, recently renegotiated client obligations as well as trade creditor obligations that had accumulated during his tenure. Finally, as explained earlier, he expected his status as a secured creditor to assure payment of the firm's debt to him before payment to unse-

---

**71.** Peter Barbara's attorney said they devised the payment arangement because Sheldon Otis, who received a 100% ownership interest in exchange for his promise to pay $5,000, otherwise could not finance the transaction. Docket # 85, p. 158.

**72.** Exhibit A.

**73.** This transaction rendered the debtor "execu-

cured creditors if priority became an issue.[74]

In sum, the benefits flowing to Peter Barbara from this transaction are unmistakably clear. The benefits, flowing to the debtor are nonexistent. If the deal between Peter R. Barbara and the debtor were conducted at arms length, this court believes the latter would have bargained harder and received more in return as a consequence. As a result this court holds that the transaction in question was not an arms-length transaction. Moreover, any value received by the debtor was negligible and certainly of far less value than which the debtor gave up. This court holds that the debtor's estate was unreasonably depleted and hence it did not receive fair consideration.

### 2. *Good faith*

█ Because the Debtor did not receive the reasonable equivalence for that which it gave away, there can be no finding of fair consideration. If, however, there had been a finding of fair equivalence, this court would still hold, based on the lack of good faith, that the debtor did not receive fair consideration.

The evidence is clear that Peter Barbara's motivation for being involved in this transaction extended beyond a mere desire to safeguard any interests that were in need of protection. There is no evidence that the transaction was motivated by Peter Barbara's need to satisfy a pre-existing debt owing to him by the debtor. This court finds that Peter Barbara was instead motivated by a desire to sell stock at a price that unreasonably exceeded its' value. Moreover, Peter Barbara, by making himself a secured creditor elevated himself to a first place position in the line of creditors. This clearly is the type of harm to the other creditors which would not typically result from the postponement of their claims.

Finally, Peter Barbara aided the debtor in the debtor's fraudulent scheme. This Court's discussion of actual fraud concludes that the transaction in question is alternatively voided on the ground that the Debtor acted with intent to hinder, delay, or defraud. *See infra.* Peter Barbara is guilty of more than merely knowing that the Debtor was in a poor financial condition or that the Debtor intended to defraud creditors. Peter Barbara, by participating in a transaction where he receives more than that which is necessary to protect a prior interest and the debtor effectively received nothing, clearly aided the Debtor in it's scheme to defraud creditors.

Finding that the Debtor did not receive the fair equivalent to the obligation it incurred, and that the transferee, Peter Barbara, lacked good faith, this court holds that the Debtor did not receive fair consideration as that term is used in M.C.L. §§ 566.13 and 566.14.

### Insolvency

The trustee also argues that Peter R. Barbara & Associates, P.C. was insolvent before and after the February 5, 1981 obligation and conveyance to Peter Barbara. Peter Barbara contends, however, that the trustee has failed to establish insolvency. Moreover, Barbara argues that the balance sheets prepared by firm's accountant establish the solvency of the law firm on January 31 and February 5, 1981.[75]

This court has already indicated that once the plaintiff establishes that the debtor did not receive fair consideration from transferee, the burden of establishing solvency shifts to the transferee. The debtor in the instant case did not receive fair consideration. Consequently, the burden is on Peter R. Barbara to prove the debtor's solvency. This court has considered the balance sheets, in light of the applicable law, in order to determine whether the defendant has established the law firm's

---

tion proof" as that term was used by the *McCaslin* Court. *Supra* note 39.

**74.** The court looks to the substance of a transaction. *Tacoma Association of Credit Men v. Lester*, 72 Wash.2d 453, 433 P.2d 901, 903 (1967). In *Lester*, a shareholder converted himself into

a secured creditor. Similarly, Peter Barbara converted himself from shareholder and the law firm's largest debtor to the firm's largest secured creditor.

**75.** Exhibits # 6, # 7.

insolvency and concludes that the defendant has not met its' burden.

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | 29,414 | Notes payable | 421,879 |
| Case costs advanced | 394,586 | Accounts payable | |
| Case files | 10,110,083 | –clients | 577,058 |
| Employee advances | 5,061 | –trade creditors | 569,111 |
| Prepaid interest | 1,353 | | |
| | | Employees taxes | 19,391 |
| Fixed assets[76] | 105,139 | | |
| Loan receivable | 1,641,868 | Single business | |
| Note receivable | 10,000 | taxes 1979–81 | 81,995 |
| Prepaid interest | 227 | | |
| Deposit on vehicle | 300 | Federal income | |
| | | taxes-past due | 684,017 |
| | | Deferred federal | |
| | | taxes | 4,218,687 |
| | | Long term | |
| | | liabilities | 3,201,462 |
| | | Stockholder's | |
| | | equity | 2,527,294 |
| Total assets | 12,300,894 | Total liab. | 12,300,894 |

The February 5 balance sheet represents the assets and liabilities as follows:

---

Testimony regarding the nature of the personal injury firm's "assets" persuades the court that the balance sheet presents a grossly distorted and inaccurate picture of Peter R. Barbara & Associates, P.C.'s financial condition between November and February 5, 1981. One example is the asset styled "case costs advanced." The "value" attributed to the asset denotes costs actually incurred and presumably paid[77] by the personal injury law firm on behalf of its clients, i.e. expenses for experts, file fees, court fees, and court reporters.[78] However, only when and if a personal injury law firm successfully concludes the case does the firm have a claim for reimbursement of "case costs advanced." Nevertheless, these litigation-related expenditures are properly listed as "assets" for accrual accounting purposes.[79] Similarly, the $10,110,083 value ascribed to the law firm's "case files" represents a balance sheet "value" entered for accrual accounting purposes.[80] Peter Barbara's law firm accounting expert did not opine as to the "present fair salable value" of either the case files[81] or the law firm's rights under its contingent-fee contracts on February 5, 1981.[82] Rather, the accounting expert explained only that, under generally

76. The law firm had no interests in real estate. Its fixed assets on November 30, 1980 consisted of office furniture, leasehold improvements, company vehicles, and books. See Exhibit A. However, the books were not listed as assets on January 31 or February 5, 1981. Exhibits # 6, # 7.

77. Peter Barbara admits that the firm still owed money to a number of doctors for services performed on cases that had been concluded. Docket # 87, p. 38, lines 6–7.

78. Docket # 87, p. 173, lines 19–25.

79. Docket # 87, p. 174, lines 8–9.

80. Docket # 87, p. 174, lines 21–24.

81. Peter Barbara admits that the causes of action and the "actual papers" in the files belonged to the individual clients with the law firm's interest being limited to the amount specified under the contingent-fee contract or to an amount "earned" before termination of the attorney-client relationship. Docket # 87, p. 84, lines 7–17.

82. Sheldon Otis obtained 100% ownership interest for $5,000 by purchasing one share of stock in the law firm.

accepted accounting principles, it would be "inappropriate not to include ... a number for the work in process" for a personal injury law firm.[83]

Peter R. Barbara & Associates, P.C. worked under contingent-fee contracts relating to six categories of cases: auto negligence, intentional torts, products liability, civil rights, F.E.L.A., malpractice, and worker's compensation.[84] The number of cases the law firm had "in process" on February 5, 1981 is unclear. Although Peter Barbara maintained at trial that the firm had 2,263 files in the office, the trustee's accountant and a former clerk at the law firm disputed the validity of that number.[85] Indeed, neither Peter Barbara's testimony nor that of the associates who assisted him with the inventory persuades this court that the firm had 2,263 files or contracts in February 1981. The court considers it significant that Peter Barbara did not obtain an independent inventory or evaluation of the files and contract rights.[86]

The fact that a law firm's rights under employment contracts are contingent does not degrade those rights to mere expectancies. On the contrary, the law has long recognized that a contingent future interest is "property," at least for purposes of marital and estate tax evaluations. *Brown v. Brown (In re Marriage of Brown)*, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561, 566, n. 8 (1976); *Estate of Zuber*, 146 Cal. App.2d 584, 590, 304 P.2d 247 (1956); *Estate of Curry*, 74 U.S.T.C. 540 (1980). It is also well known that a lawyer working under a contingent fee arrangement "finances the case for the client during the pendency of the lawsuit. If a lawyer [were] forced to borrow against the legal services already performed on a case which took five years to complete, the cost of such a financing arrangement could be significant." *Cazares v. Saenz*, 208 Cal. App.3d 279, 256 Cal.Rptr. 209, 214, (1989).[87] Peter Barbara's attorney introduced neither testimony to support a finding that the law firm's contingent-fee contract rights had a "sale" value on February 5, 1981, nor case law to support an argument that such contract rights constituted "assets" for purposes of an insolvency analysis under the Uniform Fraudulent Conveyance Act.

▬ The court is convinced, by the nature of contingent-fee contracts in general as well as by the testimony at trial indicating that the Peter R. Barbara & Associates, P.C. contingent-fee contracts totally lacked immediate "assignability" value and liquidity, that the law firm's rights under the contracts were inchoate and had no "present sale value"[88] on February 5, 1981. Similarly, after considering the nature of the assets styled "case costs advanced," the court concludes that the law firm's claims against its clients for litigation-related expenditures also were inchoate and uncertain in amount on February 5, 1981. Neither of these assets could be immediately "liquidated to satisfy creditor creditors if necessary."[89]

---

**83.** *Id.*

**84.** Not until successful conclusion of a case may a law firm assign an "account receivable" status to the contract. According to the law firm's financial statements, outstanding loans to a bank had been secured by a general assignment of the firm's accounts receivable. Exhibit A, p. 22.

**85.** Docket #85, pp. 37–41.

**86.** Peter Barbara's law firm accounting expert explained the methodology he used in assigning a value to these case files. First, he assumed that both Sheldon Otis (buyer) and Peter Barbara (seller) had negotiated and arrived at a value for the files. He further assumed the numbers were accurate. Under those circumstances he believed the method used by Peter Barbara to determine a redemption price was a reasonable one. Docket #87, pp. 176–177.

However, nothing establishes that Sheldon Otis negotiated the price, and nothing establishes the accuracy of the numbers to this court's satisfaction.

**87.** Despite Peter Barbara's claimed expertise at predicting the settlement or judgment value of causes of action, the outcome of the cases remains uncertain until a settlement or an unappealed judgment is entered. Until then, the attorney who works under a contingent-fee contract has "gambled" on the chance of making a profit. *Schlecht v. Schlecht*, 168 Minn. 168, 209 N.W. 883, 884 (1926).

**88.** Docket #86, p. 131, lines 3–25. See also *Selling a Law Firm: Ethics Rules Eyed*, 68 A.B. A.J. 406, 407, April 1982.

**89.** *Fleet supra*, at 425.

As a result, the court may not consider the $394,586 and the $10,110,083 values attributed to case costs advanced and case files in calculating the value of the firm's "present fair salable assets." This is true despite the apparent propriety of treating them as receivables or as assets for accrual accounting purposes.[90]

Serious questions also exist regarding the "present fair salable value" of other "assets" listed on the balance sheet. Notes receivable, such as M. Palozzi's $10,000 note, have uncertain "salable value."[91] The present salable value of Peter Barbara's "loan receivable" account also was uncertain in view of his imminent suspension from practice and the extended payout rights he received under the stock repurchase agreement. In addition, although items such as "advances to employees" and "prepaid interest" may be considered "assets" for accounting purposes, there can be no claim that they have "salable value" for purposes of a "fair salable value" analysis. *Holahan v. Lewis*, 182 F.Supp. 473, 476 (N.D.Fla.1960). Therefore, the court gives little weight to the value attributed to the note and loan receivable and no weight to the value attributed to the advances to employees and to prepaid interest.

After removing the assets deemed inappropriate for inclusion in the insolvency calculation and after recognizing the uncertain or negligible value of other "assets," the court concludes that Peter R. Barbara & Associates, P.C.'s acknowledged liabilities on February 5, 1981, just before the stock transfers, exceeded its then-existing assets. Including cash, fixed assets, Peter Barbara's loan receivable and M. Palozzi's note receivable at undiscounted values, the total "present fair salable value" of the law firm's pre-transfer assets amounted to $1,786,421 while its liabilities amounted to $2,353,351. Just after the stock transfer transaction, the assets had the same "fair salable value" and the firm's liabilities (excluding deferred federal income tax) amounted to $5,554,813. As discussed earlier, possession of the repur-

chased 749 share certificates represented only the ability to sell units of ownership interest, an ability the corporation had under Michigan law before the firm executed the stock repurchase agreement. The evidence of the law firm's insolvency both before and after the stock repurchase is overwhelming. This court holds that at neither point did the fair salable value of the debtor's assets match that which was required to pay the debtor's probable liabilities as they became absolute and matured.

■ This Court concludes, as a result of its findings regarding the lack of fair consideration received by the transferor and the transferor's insolvent state at the time of the transfer, that the obligation incurred and the security interest given by Peter R. Barbara & Associates, P.C. to Peter Barbara constituted fraudulent conveyances under M.C.L. § 566.14 and, therefore, are voidable by trustee.

Peter Barbara cannot claim rights as an "innocent grantee," guilty only of constructive fraud. In other words, he cannot retain what he or others received on his behalf as a result of the obligation and security interest. *Baker v. Hellner*, 265 Mich. 625, 631, 251 N.W. 793 (1933); M.C.L. § 566.19(2). As the sole shareholder and dominant figure in the law firm, he was responsible for the firm's failure to pay federal and state taxes and was responsible for negotiating extended-payment contracts with the firm's former clients. In addition, he caused the firm to incur the $3,365,000 obligation and to grant an all-inclusive security interest to himself. Significantly, he took these actions at a time when he knew of the law firm's serious financial condition. He can hardly expect to merit any rights as an "innocent grantee."

### ACTUAL FRAUD FOUND

■ The trustee's final argument under the Uniform Fraudulent Conveyance Act is that Peter R. Barbara & Associates, P.C.,

---

**90.** Docket # 87, pp. 173–174.

**91.** This note receivable appeared on the November 30, 1980 balance sheet. Exhibit A. The court has no information concerning the collectibility of the promisor.

through its president Peter Barbara, acted with actual intent to hinder and delay the law firm's creditors. This court agrees with the trustee and finds that six of the seven badges of fraud mentioned earlier are present in this case.

The first badge, debtor-transferee relationship, is present. While Peter R. Barbara was the transferee he was also the one making the loan decisions for the debtor. In order to determine the debtor's intent when the debtor is a law firm, one must look to and impute the intent of those making the decisions for the law firm. In the instant case, this was Peter R. Barbara. This court finds that Peter Barbara's actions evidence his intent to obtain a preferred position for himself by converting his position from that of the firm's largest debtor and only shareholder to that of a secured creditor.

The second and third badges, lack of consideration and insolvency of the debtor, have already been found by this court to be present. Under the constructive fraud analysis, this court found that the debtor did not receive fair consideration and the debtor was insolvent just prior to or as a result of the transaction now under attack.

This court finds that the fourth badge, transferring debtor's entire estate, is to a large extent present in this case. The obligation and security arrangement entered into by the debtor resulted in a transfer of the law firm's only liquid and salable assets, thus placing them outside the reach of unsecured creditors such as the plaintiffs in this proceeding.

Also, this court finds that the sixth badge of fraudulent intent, concealment of the transaction, is present. While the defendant may argue that the transaction was conducted openly and not in secret, this court finds that Peter R. Barbara formulated this transaction in order to conceal and cover up what this court has found to be a unfair and fraudulent deal.

Finally, the seventh badge, pendency or threat of litigation, is present to the extent that the litigation against Barbara can be imputed to the debtor and the debtor's (through Barbara) motivation for consumating this transaction. Barbara's actions included negotiating agreements with former clients who had complained to the Attorney Grievance Board about his failure to turn over their judgment and settlement proceeds and persuading each to become a contract creditor of the law firm, accepting the law firm as the primary obligor. At the same time, he rejected suggestions that he set up a trust account that would assure payment of trade creditors and former clients from fees received under the contingent-fee contracts.[92] Instead, he transferred ownership to Sheldon Otis and caused the firm to repurchase his own shares at an exhorbitant amount.[93]

Based on the evidence presented and the applicable law, this court finds that Peter R. Barbara, while consumating the transaction in question, proceeded with *actual* intent to hinder, delay and defraud creditor's of the law firm. Moreover, this court finds that Peter R. Barbara's position allowed him to dominate and control the debtor's disposition and that as a consequence Barbara's intent is imputed to the debtor. Therefore, the court concludes that the obligation to repurchase the 749 shares of stock and the security interest are voidable under the "actual fraud" provision of M.C.L. § 566.17 as well as under the "constructive fraud" provision of M.C.L. § 566.14.

### ALTERNATIVE HOLDING—EQUITABLE SUBORDINATION

Alternatively, the trustee argues that the court should subordinate Peter Barbara's claim against the debtor to the claims of all other creditors. Under the doctrine of *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, Peter Barbara, as president and

---

92. Docket # 87, pp. 90–91.

93. While it may have been Peter Barbara's hope that the firm's creditors would be paid eventually, it is clear to this court that he intended to delay payment as long as possible. It is also clear that he took a security interest in the firm's only liquid and "salable" assets, thus placing them outside the reach of unsecured creditors such as the plaintiffs in this proceeding.

sole shareholder of Peter R. Barbara & Associates, P.C., owed a fiduciary duty to the law firm's creditors. Peter Barbara flagrantly ignored his fiduciary duty. During the 1970's, Peter Barbara, as president of the law firm, paid himself a large salary and withdrew almost two million dollars from the firm as "loans." During the same time period, he failed to pay his clients their judgment and settlement proceeds and failed to pay state and federal taxes. When faced with certain suspension from practice and with prosecution under federal criminal statutes, he cleverly manipulated the affairs of the law firm by selling part of his ownership interest in the law firm for $5,000 and by converting his ownership interest into a secured claim through a repurchase agreement. Thus, he attempted to establish a safe position for himself.

As the United States Supreme Court explained in *Pepper v. Litton, supra,* a corporate officer should not succeed in attempts to use his power and inside knowledge of the firm's financial condition to his personal advantage and to the detriment of creditors "no matter how meticulous he is to satisfy technical requirements." *Pepper v. Litton,* 308 U.S. at 311, 60 S.Ct. at 247. In the case at bar, Peter Barbara used a *Zenz* transaction, a transaction that is legal and ethical when used appropriately, to effect his withdrawal from the law firm. Assuming that his personal valuation of the firm's "assets" would withstand scrutiny and would suffice to meet the standards of Michigan corporation law, he structured a stock purchase agreement that he argues is valid under Michigan law and thus cannot be "fraudulent."

 This court has already found the obligation incurred and security interest arrangement between Peter Barbara & Associates, P.C. and Peter Barbara violative of the fraudulent conveyance act. Therefore, it is unnecessary to determine whether the repurchase also violates Michigan's corporate law. Assuming that the court had found the transfers to Peter Barbara technically valid both under fraudulent convey-

ance law and under general corporate law, the court would still be compelled to subordinate Peter Barbara's claim under equitable principles incorporated into the Bankruptcy Code. Equity will not permit a shareholder to use his position to transform himself into a secured creditor to the impairment of his law firm's creditors. Rather, it will "undo the wrong or intervene to prevent its consummation." *Pepper v. Litton,* 308 U.S. at 311, 60 S.Ct. at 247.

 In sum, this court has already found that Peter Barbara was an insider of the law firm, as that term is used in the Bankruptcy Code. The result of this finding is that the trustee had only to meet the initial burden of providing substantial facts to overcome the prima facie validity of Peter R. Barbara's proof of claim. This court is convinced that the trustee has more than met this initial burden. Consequently, the burden shifts to Peter R. Barbara to demonstrate that he acted with good faith and fairness. He is unable to meet this standard. This court finds that in bringing about the transaction in question, Barbara acted fraudulently, breached his fiduciary duties, and used the debtor as his instrumentality.[94] Moreover, this transaction resulted in injury to the debtor's remaining creditors and by propelling Peter R. Barbara to the position of secured creditor, conferred an unfair advantage on Barbara. Even if this court were to find that the transaction was technically nonfraudulent, the claim that resulted from this transaction would still be equitably subordinated, as such a holding comports with the policies stated in the Bankruptcy Code.

## IV. FINDINGS AND CONCLUSIONS

(1) The February 5, 1981 obligation incurred by Peter R. Barbara & Associates, P.C. in favor of Peter R. Barbara, as expressed in the promissory note and stock purchase agreement submitted as Exhibit A, was incurred without "fair considera-

---

**94.** Thus even if the entire burden of proving egregous conduct remained with the trustee, an alternative holding, equitable subordination, would be required by this court. *See In re Shelter Enterprises Inc.,* 98 B.R. 224 (Bankr.W. D.Pa.1989).

tion" from the standpoint of Peter R. Barbara & Associates, P.C.'s creditors.

(2) The February 5, 1981 security interest as expressed in Exhibit A constitutes a conveyance made without "fair consideration" from the standpoint of the law firm's creditors.

(3) The "present fair salable value" of Peter R. Barbara & Associates, P.C.'s assets on February 5, 1981 was less than the amount required to pay its probable liability on its then-existing debts, matured and unmatured, on the same date.

(4) Peter R. Barbara & Associates, P.C. was insolvent within the meaning of M.C.L. § 566.12 on February 5, 1981.

(5) Peter R. Barbara & Associates, P.C.'s February 5, 1981 incurrence of a $3,365,000 obligation and grant of a security interest in all present and future assets in favor of Peter R. Barbara constituted fraudulent conveyances within the meaning of M.C.L. § 566.14 and § 566.17 and are avoided under those sections and § 544(b) of Title 11.

(6) Peter R. Barbara, having arranged and participated in the February 5, 1981 transaction without good faith as to the rights of creditors and with actual intent to hinder and delay them in any future efforts to execute against the law firm's assets in order to recover monies acknowledged to be due them as unsecured creditors, is not entitled to retain the obligation or the security interest under M.C.L. § 566.19(2).

(7) Peter R. Barbara's claim against the estate is disallowed.

(8) The trustee is entitled to recover the amounts transferred to or to the order of Peter R. Barbara as payments under the promissory note executed by Peter R. Barbara & Associates, P.C. on February 5, 1981, $93,972.67, plus interest as provided by law.

(9) Peter R. Barbara is returned to his status prior to the execution of the stock repurchase on February 5, 1981, that of owner of 749 shares of stock in Peter R. Barbara & Associates, P.C. and of a debtor owing $1,641,868 under a shareholder loan arrangement, as acknowledged by Exhibit A, plus interest as provided by contract or by law, whichever is greater.

(10) Alternatively, the court also concludes that it would be inequitable for Peter Barbara to receive payment on his claim until all other creditors have been satisfied and, therefore, his claim must be subordinated to those of all other creditors under 11 U.S.C. § 510(c).

The court will enter judgment for the trustee.